ACCEPTED
03-14-00304-CV
5460354
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/28/2015 4:49:18 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00304-CV

In the Third Court of Appeals

Austin, Texas

FILED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS

5/28/2015 4:49:18 PM

JEFFREY D. KYLE
Clerk

**MIKAEL AND LAURA JUDAH,** *APPELLANTS*

*v.*

**EMC MORTGAGE CORPORATION**, *APPELLEE*

APPEAL FROM CAUSE NO. D-1-GN-11-003275
345TH DISTRICT COURT OF TRAVIS COUNTY, TEXAS
HON. JON WISSER PRESIDING

## OPPOSED MOTION FOR LEAVE TO FILE NOTICE

Stephen Casey
Texas Bar No. 24065015

CASEY LAW OFFICE, P.C.
595 Round Rock West Drive
Suite 102
Round Rock, Texas 78681
Telephone: 512-257-1324
Fax: 512-853-4098
stephen@caseylawoffice.us

*Counsel for Appellants*
*Mikael and Laura Judah*

**ORAL
ARGUMENT
REQUESTED**

1

## Grounds

1. Pursuant to Texas Rules of Appellate Procedure 38.7 and Local Rule 58, Appellants file this motion for leave to file notice of additional authority.

2. The request is opposed.

3. This notice was originally filed prematurely in Envelope # 5395094 without the necessary motion for leave.

4. The motion was returned needing corrections. The entire motion and accompanying letter with attachments is being refiled to correct the deficiencies.

## Prayer

Appellant prays this Court grant this motion.

/s/ Stephen Casey
Stephen Casey
Texas Bar No. 24065015

Casey Law Office, P.C.
595 Round Rock West Drive
Suite 102
Round Rock, Texas 78681
Telephone: 512-257-1324
Fax: 512-853-4098
stephen@caseylawoffice.us

## CERTIFICATE OF CONFERENCE

I hereby certify that on May 22, 2015, I conferenced with opposing counsel who is opposed to this motion.

/s/ Stephen Casey

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing motion and accompanying letter with attachments was served upon counsel for Appellee on Thursday, May 28, 2015, via electronic transmission:

Marcie Schout
Quilling, Selander, Lownds, Winslett & Moser
2001 Bryan Street, Suite 1800
Dallas, TX 75201
Phone: (214) 871-2100
Fax: (214) 871-2111
mschout@qslwm.com
*Counsel for Appellee*

/s/ Stephen Casey



28 May 2015

Third Court of Appeals
209 West 14th Street, Room 101
Austin, Texas 78701

PO Box 12547
Austin, Texas 78711

RE:     Notice of brief affecting cited case within No. 03-14-00304-CV, *Judah v. EMC Mortgage Corporation.*

To the Honorable Justices of the Third Court of Appeals,

This notice letter and accompanying attachments directly relate to a critical underlying question in the appeal pending before this Court, No. 03-14-00304-CV, *Mikael and Laura Judah v. EMC Mortgage Corporation*, as well as other cases pending, such as No. 03-14-00135-CV, *Burge v. Ocwen Loan Servicing*; No. 03-14-00376-CV, and *Stanley v. W.R. Starkey Mortgage, LLC.*

Within Appellants' principal and reply briefs in *Judah*, the system by which Mortgage Electronic Registration System ("MERS") operates, which admittedly has zero ownership interest in any of the mortgage (i.e., no "stick" in the bundle), is directly challenged with the claim that it runs contrary to standing law in Texas for more than 160 years and all three editions of TEXAS JURISPRUDENCE.

Cited to specifically within the reply brief is the case of *Montgomery County v. Merscorp, Inc.*, No. 11-CV-6968, 2014 U.S. Dist. LEXIS 89222 (E.D. Penn Jul. 1, 2014). The district court decision in that case found that the entire concept of MERS ran contrary to the historical, and well-settled, understandings of property law theory that have existed for decades. *See id.* (esp. at 554). A courtesy copy of that opinion is attached. That case was appealed by MERS on interlocutory appeal to the federal Court of Appeals for the Third Circuit.

Important to this appeal, a critical amicus brief was filed by several parties:
1)  Law professors:
    a.  Joseph William Singer, the Bussey Professor of Law at Harvard Law School;
    b.  David Reiss, Professor of Law and Research Director at the Center for Urban Business Entrepreneurship at Brooklyn Law School;
    c.  Rebecca Tushnet, Professor of Law at Georgetown Law School; and
    d.  Melanie Leslie, Vice Dean and Professor of Law at Benjamin N. Cardozo School of Law at Yeshiva University.

And;

2)  The Harvard Law School Legal Services Center.

CASEY LAW OFFICE, P.C. • 595 Round Rock West Drive, Suite 102 • Round Rock, Texas 78681
512-257-1324 (phone) • (512) 853-4098 (fax)
*Transforming Lives Through Justice*

Page 1 of 2

These professors and this organization are requesting that the Third Circuit completely uphold the district court's decision against MERS based, in large part, that the entire concept of MERS has turned property law on its head and created a fountainhead of disaster for property owners. It is alleged in Appellants' case, and associated cases, that this turn of events has transpired in Texas, too.

A copy of the amicus brief is attached and this Court is urged to review it as it applies to critical questions in the case at bar.

A copy of this letter, the Pennsylvania opinion, and the amicus brief, have been sent certified mail, return receipt requested, to opposing counsel.

Respectfully submitted,

/s/ Stephen Casey

Enclosures:
1) District Court opinion: *Montgomery County v. Merscorp, Inc.*, No. NO. 11-CV-6968, 2014 U.S. Dist. LEXIS 89222 (E.D. Penn Jul. 1, 2014)
2) Amicus Brief in the United States Court of Appeals for the Third Circuit: No. 14-4315, *Montgomery County v. Merscorp, Inc.*, BRIEF OF AMICUS CURIAE THE LEGAL SERVICES CENTER OF HARVARD LAW SCHOOL AND LAW PROFESSORS IN SUPPORT OF THE APPELLEE.

Copy to:
Marcie Schout,
Quilling, Selander, Lownds, Winslett & Moser, P.C.
2001 Bryan Street Suite 1800
Dallas, TX 75201
*via certified mail, return receipt requested*

# [Montgomery County v. Merscorp, Inc.](#)

United States District Court for the Eastern District of Pennsylvania

June 30, 2014, Decided; July 1, 2014, Filed

CIVIL ACTION NO. 11-CV-6968

**Reporter**
16 F. Supp. 3d 542; 2014 U.S. Dist. LEXIS 89222; 2014 WL 2957494

MONTGOMERY COUNTY, PENNSYLVANIA, RECORDER OF DEEDS, by and through Nancy J. Becker in her official capacity as Recorder of Deeds of Montgomery County, on its own behalf and on behalf of all others similarly situated, Plaintiff, v. MERSCORP, INC., and MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC., Defendants.

**Subsequent History:** Amended by, Motion granted by, in part, Motion denied by, in part [Montgomery County v. Merscorp, Inc., 2014 U.S. Dist. LEXIS 129096 (E.D. Pa., Sept. 8, 2014)](#)

**Prior History:** [Montgomery County v. Merscorp, Inc., 904 F. Supp. 2d 436, 2012 U.S. Dist. LEXIS 151598 (E.D. Pa., 2012)](#)

**Counsel:** [**1] For Montgomery County, Pennsylvania, Recorder of Deeds, BY AND THROUGH NANCY J. BECKER, IN HER OFFICIAL CAPACITY AS THE RECORDER OF DEEDS OF MONTGOMERY COUNTY, PENNSYLVANIA, ON ITS OWN BEHALF AND ON BEHALF OF ALL OTHERS SIMILIARLY SITUATED, Plaintiff: CHARLES JOSEPH LADUCA, LEAD ATTORNEY, PRO HAC VICE, CUNEO GILBERT & LADUCA LLP, Bethesda , MD; CRAIG W. HILLWIG, JOSEPH C. KOHN LEAD ATTORNEYS, ROBERT J. LAROCCA, WILLIAM E. HOESE, KOHN SWIFT & GRAF, P.C., Philadelphia , PA; GARY E. MASON, LEAD ATTORNEY, JASON S. RATHOD, LEAD ATTORNEY, PRO HAC VICE, WHITFIELD BRYSON & MASON LLP, Washington , DC; JENNIFER E. KELLY, LEAD ATTORNEY, PRO HAC VICE, JONATHAN W. CUNEO, LEAD ATTORNEY, CUNEO GILBERT & LADUCA LLP Washington , DC; JAMES C. SARGENT , JR., LAW OFFICES OF LAMB & McERLANE, P.C., West Chester , PA; MAUREEN M. MCBRIDE, LAW OFFICES OF WINDLE & McERLANE, P.C., West Chester , PA; WILLIAM H. LAMB, LAMB MCERLANE, P.C., West Chester , PA.

For Merscorp, Inc., Mortgage Electronic Registration Systems, Inc., Defendants: ROBERT M. BROCHIN, LEAD ATTORNEY, MORGAN, LEWIS AND BOCKIUS, Miami , FL; ANDREW C. WHITNEY, FRANCO A. CORRADO, KRISTOFOR T. HENNING, NICHOLAS C. VANCE, MORGAN LEWIS & BOCKIUS LLP, [**2] Philadelphia , PA; BRIAN M. ERCOLE, MORGAN LEWIS, Miami , FL.

For Community Legal Services, Pennsylvania Legal Aid Network, Housing Alliance of Pennsylvania, Movants: JENNIFER R. CLARKE, PUBLIC INTEREST LAW CENTER OF PHILADELPHIA, Philadelphia , PA.

**Judges:** J. CURTIS JOYNER, J.

**Opinion by:** J. CURTIS JOYNER

# Opinion

[*544] **MEMORANDUM AND ORDER**

**JOYNER, J.**

This civil action is once again before the Court on cross-motions of Defendants [*545] Merscorp, Inc. and Mortgage Electronic Registration Systems, Inc. ("the MERS Defendants" or "MERS") and Plaintiff for summary judgment and partial summary judgment, respectively (Doc. Nos. 67 and 80). For the reasons set forth below, Plaintiff's motion shall be granted in part and Defendants' motion denied in its entirety.

### Factual Background

As outlined in our previous Memoranda adjudicating the various motions filed earlier in this matter, Plaintiff, Nancy Becker, is the Recorder of Deeds in and for Montgomery County, Pennsylvania. She filed this lawsuit on behalf of herself and all other Pennsylvania Recorders of Deeds alleging that by creating and maintaining a private, members-only registry for recording and tracking conveyances of interests in real property, the MERS

Defendants have violated 21 P.S. §351 [**3] [1] which requires that such conveyances be publicly recorded in the county recorder of deeds offices. Specifically, Plaintiff is challenging the practice by which MERS serves as the mortgagee of record in the public land records as the "nominee" for a lender who holds the mortgage note and its successors and assigns and thereby circumvents the need to record the transfer of the note each time it is sold.

As a result of what Plaintiff contends are Defendants' negligent and willful violations of the foregoing statute, Plaintiff seeks both monetary and equitable relief in the form of a declaration and/or permanent injunction directing Defendants to record mortgage assignments as well as an order quieting title and finding that Defendants were unjustly enriched. By the motions which are now before us, the parties ask this Court to enter judgment and partial judgment in their favor as a matter of law, asserting that the dispute between them is primarily legal in nature and that there are no material facts in dispute. (See, e.g., MERS Defendants' Memorandum of Law [**5] in Support of Motion for Summary Judgment, p. 8).

## Standards For Adjudicating Summary Judgment Motions

It is *Fed. R. Civ. P. 56* which outlines the standards to be employed by the federal courts in considering motions for summary judgment. *Subsection(a)* of that rule provides the following in relevant part:

> A party may move for summary judgment, identifying each claim or defense - or the part of each claim or defense - on which summary judgment is [*546] sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law...

In reviewing the record before it for purposes of assessing the propriety of entering summary judgment, the court should view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Ma v. Westinghouse Electric Co., No. 13-2433, 559 Fed. Appx. 165, 2014 U.S. App. LEXIS 5049, *9 (March 18, 2014); Burton v. Teleflex, Inc., 707 F.3d 417, 425 (3d Cir. 2013). The initial burden is on the party seeking summary judgment to point to the evidence "which it believes demonstrate the absence of a genuine issue of material fact." United States v. Donovan, 661 F.3d 174, 185 (3d Cir. 2011)(quoting [**6] Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed.2d 265 (1986)). An issue is genuine only if there is a sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law. Kaucher v. County of Bucks, 455 F.3d 418, 423 (3d Cir. 2006)(citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed.2d 202 (1986)).

However, to survive summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the non-movant. Jakimas v. Hoffmann-LaRoche, Inc., 485 F.3d 770, 777 (3d Cir. 2007). And, "if there is a chance that a reasonable juror would not accept a moving party's necessary propositions of fact," summary judgment is inappropriate." Burton, supra, (quoting El v. SEPTA, 479 F. 3d 232, 238 (3d Cir. 2007)).

The rule is no different where there are cross-motions for summary judgment. As the Third Circuit Court of Appeals

---

[1]  §351. Failure to record conveyance

All deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth, upon being acknowledged by the parties executing the same or proved in the manner provided by the laws of this Commonwealth, shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate. Every such deed, conveyance, contract, or other instrument of writing which shall not be acknowledged or proved and recorded, as aforesaid, shall be adjudged fraudulent and void as to any subsequent bona fide purchaser or mortgagee or holder of any judgment, duly [**4] entered in the prothonotary's office of the county in which the lands, tenements, or hereditaments are situate, without actual or constructive notice unless such deed, conveyance, contract, or instrument of writing shall be recorded, as aforesaid, before the recording of the deed or conveyance or the entry of the judgment under which such subsequent purchaser, mortgagee, or judgment creditor shall claim. Nothing contained in this act shall be construed to repeal or modify any law providing for the lien of purchase money mortgages.

has observed: "cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, [**7] and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." Lawrence v. City of Philadelphia, 527 F.3d 299, 310 (3d Cir. 2008)(quoting Rains v. Cascade Industries, Inc., 402 F.2d 241, 245 (3d Cir. 1968)). And, the mere fact that "both parties seek summary judgment does not constitute a waiver of a full trial or the right to have the case presented to a jury." Facenda v. N.F.L. Films, Inc., 542 F.3d 1007, 1023 (3d Cir. 2008)(quoting 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure §2720* (3d ed. 1998), at 330-331).

## Discussion

According to the MERS Defendants,

"[t]he following five legal questions and issues are presented to the Court in this summary judgment motion:

(1) whether Plaintiff has shown that the MERS Defendants have any mortgage assignments to land in Montgomery County, Pennsylvania that have not been recorded pursuant to the mandate in Section 351 (as interpreted by this Court) requiring the recording of all conveyances of land;

(2) [**8] whether, in the absence of any such written mortgage assignments, Section 351 requires the transfer of secured debt to first be documented in a form suitable for recording and then recorded in the land records because it creates in the transferee an equitable interest in the mortgage;

[*547] (3) if transfers of secured debt must first be documented and then recorded under Section 351, whether the MERS Defendants have been the transferor or transferee of any such secured debt and, if they have not, whether, the MERS Defendants are the proper parties who are liable for and subject to the "mandates contained in Section 351;

(4) if Section 351 requires the documenting and recording of transfers of secured debt and the MERS Defendants are the proper defendants, but Section 351 creates no private cause of action on behalf of the County Recorder, whether the statute can be enforced by the Recorder of Deeds by bringing claims for quiet title and unjust enrichment as a means to enforce the statutory requirements contained in Section 351; and lastly,

(5) if summary judgment is not granted on any of the previous four issues, whether Plaintiff has presented the necessary proof to establish the elements [**9] of her claims for unjust enrichment and to quiet title to land."

(Defendants' Memorandum of Law in Support of Motion for Summary Judgment, p. 9).

By her response in opposition and cross-motion for partial summary judgment, Plaintiff rejoins that the entry of an Order of Declaratory Judgment finding that Defendants have violated and are currently violating 21 P.S. §351 with the result that they have been unjustly enriched at the expense of all of the county recorders of deeds in Pennsylvania is appropriate. More particularly, Plaintiff submits that because the promissory note and mortgage are inseparable and an assignment of mortgage constitutes a recordable conveyance of title in land, this Court should reject MERS' argument that its system is lawful because there is no legal requirement to publicly record promissory notes.

We begin by noting that Defendants' Question 4 has already been effectively answered by our Memorandum of October 19, 2012 wherein we found no need to reach the question of whether Section 351 bestowed a private right of action because Pa. R. C. P. No. 1061(b)(3) permitted Plaintiff to pursue an action to quiet title.[2] Thus, inasmuch as this finding established the [**10] law of the case, we see no need to discuss it further.[3] To appropriately address and answer Defendants' other questions and the arguments advanced by Plaintiff, we must confront head-on the model upon which Defendants' entire business is built and in so doing determine whether the "splitting" of a promissory

---

[2]  See also, Memorandum of March 6, 2013 wherein we denied Defendants' second motion to dismiss the complaint and reiterated that Pa. R. C. P. 1061 permitted a quiet title action absent an interest in the underlying land at issue.

[3]  The law of the case doctrine essentially holds that when a court decides upon a rule of law, that decision should continue to govern the same issues in the subsequent stages in the same case in the absence of extraordinary circumstances such as where the initial decision was clearly erroneous and would make a manifest injustice. Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 816, 108 S. Ct. 2166, 2177-2178, 100 L. Ed.2d 811, 830 (1988); [**11] Benjamin v. Department of Public Welfare of Pennsylvania, 701 F.3d 938,

note from the mortgage lien that secures it obviates the recording requirements imposed [*548] under the Pennsylvania statute.[4] Underscoring this inquiry are the threshold questions of what *is* a mortgage under Pennsylvania law and what are the purposes of the Pennsylvania recording laws?

*A. What is a Mortgage?*

As generally described above, the ordinary mortgage consists of two instruments - the note or bond [5] and the mortgage instrument itself. The mortgage is simply security for the payment of the note, with a right of a lien on the mortgage premises to enforce payment. Philadelphia Federal Credit Union v. Ankrah, Civ. A. No. 13-3040, 2014 U.S. Dist. LEXIS 21095 at *8 (E.D. Pa. Jan. 30, 2014). [**14] "A mortgage, unless it contain some express covenant to that effect, is not of itself an [*549] instrument which imports any personal liability for the money it secures." Baum v.

---

949 (3d Cir. 2012). The law of the case rules have developed to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit. Pharmacy Benefit Manages Antitrust Litigation, 582 F.3d 432, 439 (3d Cir. 2009).

[4] Indeed, we outlined the process by which MERS functions in our Memorandum Opinion of October 19, 2012 denying the defendants' motion to dismiss in large part. As we explained:

> The typical residential mortgage finance transaction results in two legally operative documents: (1) a promissory note, a negotiable instrument which represents the borrower's repayment obligation over the term of the loan; and (2) a mortgage, representing the security interest in certain property which entitles the holder of the note to foreclose on the property in the event of default on the note. ... MERS enters a mortgage finance transaction when the lender and the borrower name MERS, in the mortgage instrument, "as the mortgagee (as nominee for the lender and its successors and assigns)." ... The attendant promissory note is sold on the secondary mortgage market and may, over [**12] its term, have many owners. Sale of the note onto the secondary mortgage market principally takes two forms. In one, relatively straightforward, transaction, a lender who retains a note as part of its own loan portfolio transfers the note to another party for that party to hold for its own account or portfolio. ... In the other, a more complex process called securitization, the note is transferred, along with many other notes, through several different entities into a special purpose vehicle, typically a trust; the trust then issues securities backed by the trust corpus, i.e., the notes, to investors. ... Regardless of the secondary market route which the note takes, MERS remains the named mortgagee as "nominee" for the subsequent owners of the note as long as the note is held by a MERS member. ...
>
> ...
>
> Before the formation of MERS, secondary market investors generally required recorded assignments for most transfers of prior ownership interests [in security interests, i.e. mortgages.] ... This system entailed substantial administrative burdens on secondary mortgage market participants. ... As a result, in 1993, the Mortgage Bankers' Association ("MBA") Interagency Technology Task Force [**13] published a "white paper" ... that describes an electronic book entry system for the residential mortgage industry. At the time, among other benefits to the mortgage industry, MERS proponents claimed that "once MERS is established as the mortgagee of record, all subsequent transfers of ownership would be recorded electronically, eliminating the need to physically prepare, deliver, record and track assignment documents. The estimated cost savings for assignment processing for a single transfer would be an average of $45.50 per loan. ... So instead of effecting formal assignments of a mortgage when MERS members transfer the accompanying note between one another, the MERS members simply register the change in beneficial ownership in the MERS electronic database. ...
>
> See, 904 F. Supp.2d 436, 439-440, 441 (E.D. Pa. 2012)(internal citations omitted).

[5] Historically, mortgages were accompanied by a bond, which was "a promise to pay a sum of [**15] money according to the terms, covenants and conditions set forth in the instrument," and a warrant of attorney authorizing "any attorney-at-law to appear for the obligor and confess judgment against that obligor for the penal sum of the bond." Ladner, *Conveyancing in Pennsylvania* §25.02(a), (b) (5th ed. 2013). "In modern mortgage practice, promissory notes have supplanted bonds and warrants as the underlying obligation in residential mortgage transactions and in most commercial transactions as well." Id.

Tomkin, 110 Pa. 569, 572, 1 A. 535, 536, 17 Week. Notes Cas. 535, 43 Legal Int. 262, 33 Pitts. Leg. J. 200 (1885). In Pennsylvania,

> [a] mortgage may be created as well without as with an accompanying personal obligation of the mortgagor to pay the debt secured, or attempted to be secured thereby. In the one case the property alone is charged with the lien - is looked to solely by the mortgagee out of which to make his lien; in the other, he has the additional security of the personal obligation of the mortgagor. A debt chargeable only against certain property is, in effect, simply a debt with limited means of satisfaction or enforcement; the value of the property charged with the indebtedness is the measure of the security afforded.

Hartje's Estate, 345 Pa. 570, 574, 28 A.2d 908, 910 (1942). Accordingly, under Pennsylvania state law, a valid mortgage can be created without requiring the mortgagor to assume personal liability under a note. In re Farris, 194 B.R. 931, 940 (Bankr. E.D. Pa. 1996).[6]

Typically, a mortgagor's failure to pay the amounts due and owing under the note constitutes an event of default following which the holder may proceed to enforce the terms of the mortgage either through *in rem* foreclosure proceedings or by obtaining an *in personam* judgment on the note and seeking to execute. Amerco Real Estate Co. v. Appalachian Self Storage, LLC, Civ. A. No. 3:11-CV-1166, 2012 U.S. Dist. LEXIS 116997 at *21 (M.D. Pa. Aug. 20, 2012)(citing Wilson v. Parisi, 549 F. Supp. 2d 637, 655 (M.D. Pa. 2008)). See also, PFCU v. Ankrah, supra, ("The holder of a bond and mortgage can proceed *in rem* or *in personam* to enforce his claim; he may proceed by an action of mortgage foreclosure or by an action on the bond which the mortgage secures." (citing *U.S. Bank, N.A. v. Mallory, 2009 PA Super. 182, 982 A.2d 986, 992 n.3 (Pa. Super. Ct. 2009)*; Levitt v. Patrick, 2009 PA Super. 117, 976 A.2d 581(2009) and Bank of Pennsylvania v. G/N Enterprises, Inc., 316 Pa. Super. 367, 371, 463 A.2d 4, 6 (1983)). To be

sure, by having a loan secured by both a mortgage and a bond or note, a mortgagee has a choice of remedies - one against [**17] the mortgaged property, the other against the mortgagor personally. See, Ladner, at §22.05(b). See also, Easton Theatres, Inc. v. Wells Fargo Land & Mortgage Co., 498 Pa. 557, 565, 449 A.2d 1372, 1376 (1982)(Dissenting Opinion, Flaherty, J.)("The effect of executing a bond or note secured by a mortgage, unless recourse on the bond is specifically limited, is to subject all of the real and personal property of the obligor to execution in the event of default."). While these remedies may be pursued concurrently or consecutively, the mortgage may have only one satisfaction. Schuylkill Trust Co. v. Sobolewski, 325 Pa. 422, 426-427, 190 A. 919, 922 (1937); Elmwood Federal Savings Bank v. Parker, 446 Pa. Super. 254, [*550] 666 A.2d 721, 724, n.6 (1995).

Further, inasmuch as an action in mortgage foreclosure is strictly an *in rem* proceeding the sole purpose of which is to effect a judicial sale of the mortgaged real estate, it may not include an *in personam* action to enforce personal liability, unless the mortgagor waives any objection to the inclusion of the breach of contract action for a personal judgment in the mortgage foreclosure suit. Newtown Village Partnership v. Kimmel, 424 Pa. Super. 53, 55, 621 A.2d 1036, 1037 (1993); [**18] Insilco Corp. v. Rayburn, 374 Pa. Super. 362, 368, 543 A.2d 120, 123 (1988)(citing Pa. R. C. P. 1141 and Meco Realty Company v. Burns, 414 Pa. 495, 200 A.2d 869 (1964) and First Seneca Bank v. Greenville Distributing Company, 367 Pa. Super. 558, 533 A.2d 157 (1987)). To pursue both of these remedies, however, the creditor/ mortgagee must possess *both* the note and the mortgage. See, e.g., U.S. Bank v. Montalvo, Civ. A. No. 3:08-CV-1504, 2013 U.S. Dist. LEXIS 162595 at *8 (M.D. Pa. Nov. 14, 2013)(where defendant mortgagee signatory to mortgage only and not note, plaintiff could not have brought *in personam* action against him based on any alleged failures to pay obligations due under note).

Additionally, notes secured by mortgages have been determined to be negotiable instruments under the

---

[6] Stated otherwise,

> [a] mortgage is a security instrument used by the mortgagee to secure payment of a debt or performance of an obligation. When properly executed, delivered, accepted and recorded, the mortgage places a lien on the mortgaged premises. If the mortgagor is unable or unwilling to pay the debt or perform the obligation, the mortgagee has recourse against the property. That recourse usually is a mortgage foreclosure action in court that results in a judicial sale. Being a secured creditor is important so that there is something of value that may be sold if the mortgagor defaults. And, in bankruptcy situations, secured creditors usually have preference over those that are [**16] unsecured.

Ladner, *Conveyancing in Pennsylvania*, supra, §22.01.

Pennsylvania Uniform Commercial Code,[7] such that the holder of such an instrument may be entitled to the protections afforded thereunder to a holder in due course. JP Morgan Chase Bank, N.A. v. Murray, 2013 PA Super. 55, 63 A.3d 1258, 1265 (2013); In re Walker, 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012); Deutsche Bank Nat'l Trust Company v. Carmichael, 448 B.R. 690, 694 (Bankr. E.D. Pa. 2011). Under the [**19] Code, a note may be negotiated from one person to another by mere transfer of possession. See, 13 Pa. C. S. §§3201, 3203 (governing ″Negotiation,″ and ″Transfer of instrument; rights acquired by transfer″). From all of this, we conclude that Defendants are correct in their assertion that Pennsylvania law does indeed recognize a clear legal distinction between a promissory note and a mortgage and that promissory notes may generally be freely transferred without the requirement of recording.

This does not end the matter, however. Again, it is the Defendants' premise that because the debt transfers at issue occur by mere delivery of promissory notes, they are not ″written instruments″ subject to [*551] the recording requirement of Section 351. Accordingly, the question which this case presents and with which we are here confronted is whether a promissory note that is secured by a mortgage also falls within the purview and meaning of a ″conveyance,″ ″contract,″ or ″other instrument of writing″ ″wherein it shall be the intention of the parties executing the same to grant, bargain, sell and convey any lands, tenements or hereditaments [**21] situate in th[e] Commonwealth [of Pennsylvania].″ 21 P.S. §351. If so, then the mandate of Section 351 is clear: it ″shall be recorded in the office for the recording of deeds in the county where such lands, tenements and hereditaments are situate.″ Id. In an effort to resolve this question, we turn now to an examination of the purposes and intentions behind the Pennsylvania Recording statutes.

## B. Pennsylvania Recording Law

Generally speaking, the primary purpose behind enactment of the Pennsylvania statutes governing recording of property conveyances was the provision of notice of the identities of those who held an interest in the real estate at issue, primarily to protect subsequent bona fide purchasers from injuries caused by secret pledges of property. 6 Summ. Pa. Jur. 2d Property §§8:112, 9:17 (2d ed.)(2012).[8] Indeed as early as 1848, the Pennsylvania Supreme Court noted that:

> ″The intention of the acts requiring deeds to be recorded was to secure subsequent purchasers and mortgagees against prior secret conveyances and fraudulent encumbrances; and therefore when a person has notice of a prior conveyance, it is not a secret conveyance by which he can be prejudiced...

Mott v. Clark, 9 Pa. 399, 405 (1848). [**22] And, just two years later, the Court observed:

> ″The principle runs through the whole system of our recording acts, that the object is to give public notice in whom the title resides; so that no one may be defrauded by deceptious appearance of title. ... The recording laws, like all other public laws are intended for the benefit and security of the people generally.″

Salter v. Reed, 15 Pa. 260, 263-264 (1850). These holdings

---

[7]  13 Pa. C. S. §3104 defines negotiable instruments and notes under the Uniform Commercial Code. See generally, 13 Pa. C. S. §3104(a), (e). Under Subsection (a), ″negotiable instrument,″ ″except as provided in subsections (c) and (d), ... means an unconditional promise or order to pay a fixed amount of money, with or without interest or other charges described in the promise or order, if it:

    (1) is payable to bearer or to order at the time it is issued or first comes into possession of a holder;

    (2) is payable on demand or at a definite time; and

    (3) does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money, but the [**20] promise or order may contain:

        (i) an undertaking or power to give, maintain or protect collateral to secure payment;

        (ii) an authorization or power to the holder to confess judgment or realize on or dispose of collateral;

        (iii) a waiver of the benefit of any law intended for the advantage or protection of an obligor.″

  Subsection (e) states that ″[a]n instrument is a 'note' if it is a promise and is a 'draft' if it is an order. If an instrument falls within the definition of both 'note' and 'draft,' a person entitled to enforce the instrument may treat it as either.″

[8]  ″To qualify as a bona fide purchaser, a subsequent buyer must be without notice of a prior equitable interest.″ Id.

remain undisturbed despite the passage of more than 150 years and thus the underlying purpose behind the Pennsylvania recording acts remains clear - to provide notice to the public of the identities of those who hold an interest in real estate as well as notice of the true nature of the transaction on record. See, e.g., *U.S. Bank, N.A. v. Mallory, 2009 PA Super 182, 982 A.2d 986, 994, n.6 (2009)*("Mortgages are recorded to provide notice to the world as to whose interest encumbers title."); Weik v. Estate of Brown, 2002 PA Super. 63, 794 A.2d 907, 911 (Pa. Super. Ct. 2002); Roberts v. Estate of Pursley, 718 A.2d 837, 841 (Pa. Super. Ct. 1998); Mancine v. Concord-Liberty Savings & Loan Ass'n., 299 Pa. Super. 260, 445 A.2d 744 (1982); Reiter v. Kille, 143 F. Supp. 590, 592-593 (E.D. Pa. 1956)(holding [**23] that inasmuch as recording is obligatory in Pennsylvania so as to give public notice in whom title resides, federal tax lien premised on unrecorded deed ineffective as against subsequent purchaser for value); Capital Center Equities v. Estate of Gordon, 137 B.R. 600, 611 (Bankr. E.D. Pa. 1992)(quoting Jaques v. Weeks, 7 Watts 261 (Pa. 1838)). *In accord*, 1 West's Pa. Prac. §803(14)-1 (3d ed.)(2012): ("The purpose of [the] statutes [providing for the recording of deeds and mortgages] [*552] is to give notice of who holds interests in the property, to provide evidence of title in case the original documents are lost or unavailable, and to protect the interest holders from the claims of others."). And in 1852, it was determined that assignments of mortgages also fell within the recording acts. Pepper's Appeal, 77 Pa. 373, 377, 1 Week. Notes Cas. 437, 7 Legal Gaz. 205, 32 Legal Int. 321, 22 Pitts. Leg. J. 182 (1875); Philips v. Bank of Lewistown, 18 Pa. 394, 402 (1852).

While the earlier versions of the recording statutes did not make recording mandatory, nevertheless,

> "[w]hen the election [to record] is made and an instrument authorized by law to be recorded, is

[**24] actually recorded, all the incidents and force of a public record attach to that record. It is an early and well recognized principle that one great object in spreading an instrument of writing on a public record is to give constructive notice of its contents to all mankind."

Pepper's Appeal, supra.

Thus, the benefits of recording an interest in land have long been recognized in Pennsylvania and in 1863, the Pennsylvania legislature first decreed that such recording should be mandatory.[9]

*C. How Pennsylvania Law Treats Mortgages*

Over the years, however, there was some confusion over how a mortgage should be viewed by the Pennsylvania courts - was it a conveyance of title, a lien or cloud on the title of the real estate, or merely security for the payment of money or performance of some other collateral contract? See, e.g., Wilson v. Shoenberger's Executors, 31 Pa. 295, 299 (1858)("It is the settled law of the Pennsylvania mortgage, that though in form a conveyance of title, it is in reality, both at law and equity, only a security for the payment of money, or performance of other collateral contract."); McIntyre v. Velte, 153 Pa. 350, 25 A. 739 (1893)("The mortgage is but a security for the payment of money with a right of lien upon the mortgaged premises to enforce payment."); Bulger v. Wilderman, 101 Pa. Super. 168 (1931)("In [**26] form, a mortgage is certainly a conveyance; but it is unquestionably treated at law here, in the way it is treated in equity elsewhere, as a bare incumbrance, and the accessory of a debt. As between the parties it is a conveyance, so far as is necessary to enforce it as a security: as regards third persons, the mortgagor is the owner, even of the legal estate...")(quoting Presbyterian Corporation v. Wallace, 3 Rawle 109 (Pa. 1831)).

---

[9] See, Act of April 1, 1863, P.L. 188, §1 repealed in part by 42 Pa. C.S. §20002(a)[414]:

> *Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania in General Assembly met, and it is hereby enacted by the authority of the same*,

> That in all cases in which any of the former owners, or any other person, or persons, shall have, in his or their possession, any bargains of sales, deeds, conveyances, or other instruments in writing, concerning any lands, tenements or hereditaments in this commonwealth, he, or they, shall, upon six months' notice being given to him, or them, by the present owner of such premises, or by any other person, or persons, in any manner interested in any **[**25]** such bargains of sales, deeds, conveyances, or other instruments of writing, place the same upon record in the proper county, or deliver the same into the hands, or possession, of the present owner, if such application be made by him.

(Italics in original)

Thereafter, 21 P.S. §351 was enacted in 1925. See, Act of May 12, 1925, P.L. 613, No. 327, §1.

In 2004, the Pennsylvania Supreme Court decided Pines v. Farrell, 577 Pa. 564, 848 A.2d 94 (2004). Specifically the [*553] issue presented in that case was whether certain financial regulations which had been promulgated by the Court Administrator of Pennsylvania interpreting the definition of "property transfer" in 42 Pa. C. S. §3733(a.1)(1)(v)[10] to include mortgage ssignments, mortgage releases, and mortgage satisfactions were valid and enforceable. The Pines Court began its analysis with this observation:

> "Proper resolution of this question first requires an examination of the legal definition of a mortgage; *i.e.*, if a mortgage represents a property transfer, it logically follows that transactions involving mortgages are also property transfers. The "title theory [**27] of mortgages deems a mortgage to be a conveyance, while a competing theory, the "lien theory, suggests that a mortgage merely represents a security interest."

Id., 848 A.2d at 99. Recognizing that there was ample authority for both theories under Pennsylvania common law, the Supreme Court nevertheless found that such actions were "property transfers" which bound the recorders of deeds, clerks of courts and equivalent officials throughout Pennsylvania who were charged with the duty of collecting fees in connection with such transfers. Indeed, the Court reasoned:

> What definitively tips the balance in this Court's view, is that, although a mortgage can be considered both a conveyance in form as well as a security interest, for purposes of actions involving recording acts, mortgages traditionally have been treated as conveyances. "In all questions upon the recording acts, the mortgage is spoken of as a conveyance of land." ... Thus, for purposes of determining whether mortgage assignments, mortgage satisfactions and mortgage releases are property transfers, we begin with the premise that a mortgage conveys the property subject to the mortgage to the mortgagee until the obligations under [**28] the mortgage are fulfilled.

Id. at 100 (quoting In re Long's Appeal, 77 Pa. 151 (1874). From there, the Court further opined:

> Given our conclusion that a mortgage conditionally conveys the subject property, it logically follows that an assignment of the mortgagee's rights likewise effects a conditional transfer of the subject [*554] property to

---

[10] This statute reads, in pertinent part:

> §3733. Deposits into account.

> (a) *General rule.*

> (1) Beginning July 1, 1987, and thereafter, the total of all fines, fees and costs collected by any division of the unified judicial system which are in excess of the amount collected from such sources in the fiscal year 1986-1987 shall be deposited in the Judicial Computer System Augmentation Account. Any fines, fees or costs which are allocated by law or otherwise directed to the Pennsylvania Fish and Boat Commission, to the Pennsylvania Game Commission or to counties and municipalities, to the Crime Victim's Compensation Board, to the Commission on Crime and Delinquency for victim-witness services grants under section 477.15(c) of the act of April 9, 1929 ... known as the Administrative Code of 1929, to rape crisis centers, to the Emergency Medical Services [**30] Operating Fund or to domestic violence shelters shall not be affected by this subchapter.

> ...

> (a.1) *Additional fees.*

>> (1) In addition to the court costs and filing fees authorized to be collected by statute:

>> ....

>>> (v) An additional fee of $10 shall be charged and collected by the recorders of deeds and clerks of court, or by any officials designated to perform similar functions, for each filing of a deed, mortgage or property transfer for which a fee, charge or cost is now authorized. The Supreme Court shall designate by financial regulations which filings meet the criteria of this subparagraph.

the assignee. Additionally, even accepting respondent's argument that an assignee's rights cannot exceed those of the assignor, a property transfer still exists because the assignee will receive the rights held by the assignor, *i.e.*, the conveyance of the property subject to the terms of the mortgage. ... Thus, the Court Administrator correctly defined property transfer to include mortgage assignments.

Id. at 100-101 (citation omitted). The Court reached the same conclusion with respect to mortgage satisfactions and releases. That is, the effect of both a mortgage satisfaction and a mortgage release was to discharge the lien and release the mortgagor from the obligations under the mortgage and to "reconvey" the property to the mortgagor. Pines, 848 A.2d at 101, 102. See also, *First Citizens National Bank v. Sherwood, 583 Pa. 466, 879 A. 2d 178, 180, n.2 (2005)*("A [**29] transfer of title is no insubstantial thing, but rather resembles a right or privilege which is permanent in nature. The fact that at one point, the mortgagor may fulfill the obligations of the mortgage, and thereby receive title to the mortgaged property, does not negate the fact that mortgaging the property transfers the title to the mortgagee.").

While Pines may not be on all fours with the case at hand inasmuch as we are charged here with interpreting a different statute, it nonetheless represents a clear statement of Pennsylvania law which is equally applicable in this case particularly in view of its specific reference to the recording acts. Hence, inasmuch as "conveyance" is defined, *inter alia*, as "**a.** Transfer of title to property from one person to another. **b.** The document by which this transfer is effected,"[11] we likewise find that a mortgage assignment is a "conveyance" subject to the recording mandate of §351.

*D. Severability of Notes and Mortgages*

In view of this finding, we next consider whether a note memorializing debt that is secured by a mortgage stands alone such that it may be freely transferred by change in possession or whether it too must be recorded.

Under well-settled, long-held American law, where "mortgaged premises are pledged as security for debt,"... "the note and mortgage are inseparable. ..." Carpenter v. Longan, 83 U.S. 271, 274, 16 Wall. 271, 21 L. Ed. 313, 315 (1872). Thus, "[a]n assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity." Id. Indeed, "[a]ll the authorities agree that the debt is the principal thing and the mortgage an accessory. ...

The mortgage can have no separate existence. When the note is paid the mortgage expires." Id. 83 U.S. at 275, 21 L. Ed at 315. See also, National Live Stock Bank of Chicago v. First National Bank of Geneseo, 203 U.S. 296, 306, 27 S. Ct. 79, 81, 51 L. Ed. 192 (1906)(same).

These principles remain viable and are likewise embodied in the *Restatement (Third) of Property: Mortgages, §5.4* (1997), which reads as follows:

*§5.4* Transfer of Mortgages [**32] **and Obligations Secured by Mortgages**

(a) A transfer of an obligation secured by a mortgage also transfers the mortgage unless the parties to the transfer agree otherwise.

(b) Except as otherwise required by the Uniform Commercial Code, a transfer of a mortgage also transfers the obligation the mortgage secures unless the parties to the transfer agree otherwise.

[*555] (c) A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures.

Pennsylvania law was and is in accord. See, e.g., In re North City Trust Co., 327 Pa. 356, 361, 194 A. 395, 398 (1937) ("[C]ollateral for a debt follows the obligation into the hands of the assignee thereof."); Beaver Trust Co. v. Morgan, 259 Pa. 567, 103 A. 367, 369 (1918)("A purchase of a debt is a purchase of all the securities for it, whether named or not at the time of the assignment, unless expressly agreed at the time they shall not pass."); Moore v. Cornell, 68 Pa. 320, 322 (1871)("A [**33] mortgage is discharged by payment, and an assignment of the debt transfers the right to the mortgage itself; for whatever will give the money secured by the mortgage, will carry the mortgaged premises along with it."); 13 Pa. C. S. §9203(g)("The attachment of a security interest in a right to payment or performance secured by a security interest or other lien on personal or real property is also attachment of a security interest in the security interest, mortgage or other lien."). See also, Russell's Appeal, 15 Pa. 319, 321, 322 (1950)("Even, although a conveyance be absolute in its terms, if it is intended by the parties to be a mere security for the payment of a debt, it is a mortgage. ... An article of agreement for the sale of land, accompanied by delivery of possession and payment of part of the purchase-money, is much more than a chose in action; it is an abiding interest in the land itself.").

This notion that notes and mortgages are legally inter-woven is further supported by the language employed by the

---

[11]  Webster's II New Riverside [**31] university dictionary 308 3d ed. 1994)

Multistate Fixed Rate Uniform Instrument Note and Pennsylvania Mortgage forms [12] which appear to be currently utilized in most loan settlement transactions in which MERS is designated [**34] as the mortgagee. Beginning with the Note form, at paragraph 10, the following verbiage appears:

> ... In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. ...

The Mortgage, in turn, includes the following language in excerpted relevant parts:

> **Definitions**
>
> **(C) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. **MERS is the mortgagee [**35] under this Security Instrument.** ...
>
> ...
>
> **(E) "Note"** means the promissory note signed by Borrower and dated __. ...
>
> ...
>
> **(G) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under [*556] the Note, and all sums due under this Security Instrument, plus interest.
>
> ...
>
> **Transfer of Rights in the Property**
>
> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, grant and convey to MERS (solely as nominee for Lender and Lender's

successors and assigns) and to the successors and assigns of MERS, the following described property located in this __(County) of __which currently has the address of __(Street), __(City), Pennsylvania __(Zip Code) ("Property Address") ...

> TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of [**36] the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by the Borrower in this Security Instrument, but if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.
>
> ...
>
> UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
>
> ...
>
> **9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.**
>
> If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower [**37] has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court;

---

[12] We here refer specifically to Form Nos. 3200 and 3039 containing the further designation "Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT and UNIFORM INSTRUMENT WITH MERS attached as Exhibit "A1" to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Summary Judgment.

and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. ...

...

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs [*557] other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer [**38] unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a

successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

...

(Emphasis in original)

It therefore appears obvious from all of the foregoing, that whether effectuated via a writing or a mere "transfer of possession" of a note, the result is the same by operation of law - an interest in and/or title to the property which secures it has been assigned and conveyed from one party to another under Pennsylvania law.[13] As to the requirement of a writing, 21 P.S. §623-1 [14] is crystal clear: "Hereafter no assignment of any mortgage shall be entered of record in any county of the second class, unless [**39] such assignment shall be in writing, and acknowledged by the assignor or assignors before an officer or person duly authorized to take such acknowledgments." Accordingly, in answer to Defendants' question No. 2 as formulated in its motion papers, we now hereby find that the Pennsylvania Recording Act does in fact require the transfer of secured debt to first be documented in a form suitable for recording and then recorded in the land records because it creates in the transferee an equitable interest in the mortgage.[15]

[*558] We endeavor now to answer Defendants' first and third questions and to confront what is perhaps the most

---

[13] This is essentially the same conclusion which the U.S. District Court for the Eastern District of Kentucky very recently reached in Higgins v. BAC Home Loans Servicing, LP, Civ. A. No. 12-cv-183-KKC, 2014 U.S. Dist. LEXIS 43274 (E.D. KY March 31, 2014). While the Higgins case obviously required construction of Kentucky law, specifically, KRS 382.360(3), the similarities between that case and this one are striking given the direction contained in the Kentucky statute - "[when a mortgage is assigned to another person, the assignee shall file the assignment for recording with the county clerk within thirty days of the assignment..." Thus the Court in Higgins framed the [**40] issue there presented as "whether, under Kentucky law, when a MERS member assigns a promissory note to another MERS member, that note assignment effects an assignment of the mortgage that must be recorded." 2014 U.S. Dist. LEXIS at *7. And, recognizing that a note assignment may not be a physical document since a note can be assigned simply by delivery to the assignee, the Court concluded: "Thus where a secured note is assigned by delivering the note to the assignee, the assigment of the mortgage that occurs by operation of law should be recorded as provided in Kentucky's recording statutes." 2014 U.S. Dist. LEXIS 43274, at *21-*22.

[14] Statutes which apply to the same persons or things or to the same class of persons or things are in *pari materia* and should be construed together if possible as one statute. 1 Pa. C.S. §1932(a), (b); Holland v. Marcy, 584 Pa. 195, 206, 883 A.2d 449, 456 (2005). See also, Roberts v. Estate of Pursley, 1998 PA Super. LEXIS 2869, 718 A.2d 837, 841 (1998)("we adopt the theory that sections 351 and 444 of Title 21 must be read together.")

[15] We believe this conclusion is further supported by the language of 21 P.S. §444, which provides in relevant part:

All deeds and conveyances, which, [**41] from and after the passage of this act, shall be made and executed within this commonwealth of or concerning any lands, tenements or hereditaments in this commonwealth, *or whereby the title to the same may be in any way affected in law or equity*, shall be acknowledged by the grantor, or grantors, *bargainor or bargainors*, or proved by one or more of the subscribing witnesses thereto, before one of the judges of the supreme court or before one of the judges of the court of common pleas, or recorder of deeds, prothonotary, or clerk of any court of record, justice of the peace, or notary public of the county wherein said conveyed lands lie, and shall be recorded in the office for the recording of deeds where such lands, tenements or hereditaments are lying and being, within ninety days after the execution of such deeds or conveyance... (emphasis supplied).

challenging issue in this case: whether the MERS Defendants have been the transferor or transferee of unrecorded secured debt and if not, whether they are the proper parties who are subject to the mandates contained in the recording [**42] statutes.

*E. MERS as "Nominee"*

The MERS Defendants have repeatedly taken the position that, in commencing the instant action, Plaintiffs sued the wrong parties because "MERS has not and does not negotiate or transfer promissory notes secured by mortgages recorded in Montgomery County, Pennsylvania." (MERS' Memorandum of Law in Support of Their Motion for Summary Judgment, at p. 44). More particularly, MERS argues:

> But there is no circumstance and no amount of wild speculation that could lead the Court to conclude that Section 351 mandates that a person or entity who did not buy the note, did not sell the note, and was not in any way involved with the transfer of the note, either as an assignor or as an assignee, is the person or entity that Section 351 mandates is responsible for documenting and then recording note transfers or other changes in ownership of debt.

(MERS' Memo of Law in Support of Motion for Summary Judgment at p. 45).

At first blush, this argument appears compelling. However, now that it is clear that transfer of the note by operation of law also transfers the mortgage, the argument loses much of its original luster. What's more, as recited in the MERS Defendants' Memorandum [**43] of Law in Support of Their Motion for Summary Judgment at page 10:

> Defendants are MERSCORP Holdings, Inc. ("MERSCORP") and Mortgage Electronic Registration Systems, Inc. ("MERS"). MERS is a wholly owned

subsidiary of MERSCORP. MERSCORP operates the MERS ® system and membership in the MERS ® System and members are governed by the MERS ® System Rules of Membership. **It is MERS that serves as the mortgagee of record in the public land records as the "nominee" for a lender (noteholder) and its successors and assigns.** (Emphasis added)

And, under MERS Rule 8, Section 2(a),[16]

[*559] If a Member chooses to conduct foreclosures in the name of Mortgage Electronic Registration Systems, Inc., the note must be endorsed in blank and in possession of one of the Member's MERS certifying officers. If the investor so allows, then MERS can be designated as the note-holder.

Thus, in apparent contradiction to its argument, MERS at least initially acknowledges that it in fact *is* "involved with the transfer of the note" by virtue of its service as the mortgagee of record as the nominee for a lender/noteholder and its successors and assigns and that when required to facilitate a foreclosure, MERS itself can become a "note-holder."

The relationship between the MERS Defendants ("MERS") and its members is more particularly described by William C. Hultman, the Vice President of [**45] Legislative Affairs for MERSCORP and a former officer of MERS, in his Declaration which is attached to Defendants' Memorandum of Law in Support of Motion for Summary Judgment as Exhibit "A." According to Mr. Hultman,

> 6. In regard to the mortgage or security instrument, the borrower and lender contractually agree to designate MERS as the mortgagee (as the nominee for the lender and the lender's successors and assigns) such that legal title to the lender's (and its successors and assigns) secured interests in the property are held by MERS on behalf of subsequent transferees of the promissory note. MERS serves as the mortgagee of record on a mortgage,

---

[16] Attached [**44] as Exhibit "A15" to Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment and in Support of Plaintiff's Cross Motion for Partial Summary Judgment. See also, Exhibit "A16" to Plaintiff's Memorandum, Deposition testimony of R.K. Arnold, in Trent v. MERS, Case No. 3:06CV-374-J-32HTS in the U.S. District Court for the Middle District of Florida, Jacksonville Division, at p. 67, 76-77, 81-82, 112-113 on 9/25/06; Plaintiff's Exhibit "A17," Deposition testimony of William C. Hultman in Henderson v. MERS, Case No. CV 2008-900805 in the Circuit Court of Montgomery County, AL, dated 11/11/09, pp. 62-63, 108, 109-112, 114-116). It does appear, however, that in March 2013 these rules were altered such that under the current procedure governing foreclosures, an assignment from MERS to the foreclosing party or whoever will be foreclosing must first be recorded in the public land records. MERS no longer undertakes foreclosure proceedings in its own name. (Hultman Deposition, Plaintiff's Memorandum, Exhibit "A13," at pp. 62-65).

as the nominee (i.e., agent) for the lender and for the lender's successors and assigns, who are members of the MERS ® System.

...

9. From time to time, MERS assigns the MERS Mortgages. In such instances, MERS is the assignor of the MERS Mortgage, and it is a MERS Signing Officer who signs the assignment of the MERS Mortgage ("MERS Assignment of Mortgage"). Once the MERS Assignment of Mortgage is duly executed and delivered, the MERS Assignment of Mortgage is, as required by the MERS ® System rules, recorded in the public, local land records, [**46] and any fees imposed for recording the MERS Assignment of Mortgage are paid.

...

11. ... MERS's only role is and was to serve as the mortgagee on the mortgage - as the nominee (or in the stead) of the lender and the lender's successors and assigns, who are members of the MERS ® System.

...

14. When the transfer or sale of the debt or promissory note involves a MERS ® System member, MERS remains as the mortgagee of record and continues to act as the mortgagee as the nominee for the purchaser (who is the beneficial owner of the debt or note), who is then the lender's successor or assign. The MERS Mortgage is not assigned because MERS remains the mortgagee as the nominee for purchaser.

(Hultman Declaration, Exhibit "A," at pp. 3-4, 5). See also, Deposition of William C. Hultman of October 18, 2013, at p. 65-66, annexed to Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment and in Support of Cross-Motion for Summary Judgment as Exhibit "A13").

[*560] Therefore according also to Mr. Hultman, MERS is both named as the mortgagee *and* acts as agent for the lenders - not only the lender which originates the loan to the borrower, but also those lenders to whom the note is [**47] ultimately sold and transferred. It is MERS that "from time to time" will assign and record the mortgages over which it has charge in the public local land records and ensure that any associated fees therefor are paid. See also, Plaintiff's Exhibit "A10," MERS' System Rules of Membership, Section 10, p. 45). Clearly then, MERS *is* involved with the transfer of the note and mortgage and we find, is an appropriate party to this action.

We likewise reject the proposition that MERS is not subject to liability because it is only an agent for its member-lenders. Indeed, as a general matter, an "agent" is a "person authorized by another (principal) to act for or in place of him; one intrusted with another's business." BLACK'S LAW DICTIONARY 63 (6th ed. 1990). An agent holds the power to alter the legal relations between the principal and third persons. *Tribune-Review Publishing Co. v. Westmoreland County Housing Authority*, 574 Pa. 661, 675, 833 A.2d 112, 120 (2003). An agency relationship arises when the following basic elements coalesce: there is a manifestation by the principal that the agent shall act for him, the agent accepts the undertaking, and the parties understand that the principal [**48] is to be in control of the undertaking. V-Tech Services, Inc. v. Street, 2013 PA Super. 166, 72 A.3d 270, 278 (2013)(quoting Walton v. Robert Wood Johnson University Hospital, 2013 PA Super 108, 66 A.3d 782 (2013)). The party asserting the existence of an agency relationship bears the burden of proving it by a fair preponderance of the evidence. Id. (quoting Id.).

It is a basic tenet of agency law that an individual acting as an agent for a disclosed principal is not personally liable on a contract between the principal and a third party unless the agent specifically agrees to assume liability. Azarchi-Steinhauser v. Protective Life Insurance Co., 629 F. Supp. 2d 495, 499-500 (E.D. Pa. 2009)(quoting Vernon D. Cox & Co. v. Giles, 267 Pa. Super. 411, 406 A.2d 1107, 1110 (1979). Instead, the principal is liable for and bound by any acts that the agent performs with actual or implied authority from the principal that are within the scope of the agent's employment. Id. However, an authorized agent who enters into a contract on behalf of a principal without disclosing that it is acting for the principal, is personally liable on the contract. Burton v. Boland, 339 Pa. Super. 444, 446, 489 A.2d 243, 245 (1985)(citing [**49] Revere Press, Inc. v. Blumberg, 431 Pa. 370, 246 A.2d 407 (1968) and Dwyer v. Rothman, 288 Pa. Super. 256, 431 A.2d 1035 (1981)). See also, Strawbridge & Clothier v. Garment Manufacturers, Inc., 189 Pa. Super. 43, 46, 149 A.2d 471, 472 (1959)("An agent for undisclosed principals bears the legal consequences of assuming liability for those undertakings which his principals would have undertaken, had he made a disclosure."); Pennsylvania Railway Co. v. Rothstein, 116 Pa. Super. 156, 161, 176 A. 861 (1935)("It is an elemental principle of agency that to relieve himself from liability, an agent in dealing with a third party must not only disclose the fact of the agency, but also the name of his principal.").

As per Mr. Hultman,

3. MERSCORP maintains a database of the loans registered on the MERS ® System. The information on

the database tracks the beneficial interests in, and the servicing rights to, the loans registered on and by the members of the [*561] MERS ® System. It is the MERS ® System members who are responsible for and who report the transactions regarding the registered loans by inputting the data regarding the beneficial interests in, and servicing rights to, the members' particular [**50] loans registered on the MERS ® System. For example, if there is a transfer of the beneficial interests of a loan as a result of a promissory note being transferred, it is the MERS ® System member (or the MERS ® System member who is the servicer of the loan for the transferee of those beneficial interests) that reports the transfer of beneficial interests by inputting the data reflecting the transfer onto the MERS ® System database.

Neither MERS nor MERSCORP is involved in any way in the transfer, sale, or purchase of any promissory notes, and neither MERS nor MERSCORP is involved in reporting the transfer, sale, or purchase of any promissory notes by a MERS ® System member to another MERS ® System member, or by a MERS ® System member to one who is not a MERS ® System member.

(Hultman Declaration, at pp. 3-4).

Hence as Mr. Hultman's declaration attests, the identities of the lenders for whom MERS is acting as agent are only revealed to other MERS members *by* MERS members, as "neither MERS nor MERSCORP is involved in reporting the transfer, sale or purchase of any promissory notes" by one member to another nor to anyone who is not a member. (See also, Exhibit "A20" to Plaintiff's Memorandum [**51] of Law in Opposition to Defendant's Motion for Summary Judgment and in Support of Cross Motion for Summary Judgment, Deposition Testimony of R.K. Arnold in Henderson v. MERS, Case No. CV 2008-900805 in the Circuit Court of Montgomery County, AL, dated 9/25/09, at p. 112, lines 10-12: "The members utilize the [MERS] system to track the note."). That the identities of the lenders/note holders for whom MERS is ostensibly acting as agent are likewise inaccessible to licensed title agents and consumers has also been attested. (See, Plaintiff's Exhibits "B," p.5, "G," pp. 6-7 and "H," p. 6).

From this we conclude that ample evidence exists to support the argument that MERS may alternatively be held responsible as an undisclosed agent of the lenders for whom it was acting as "nominee." Accordingly, we now hold that the MERS Defendants are proper parties who may be liable for and subject to the mandates of the Pennsylvania Recording Statutes in general and Section 351 in particular. Defendants' motion for summary judgment is therefore denied as to Count I of the Complaint.

*F. Plaintiff's Claims for Unjust Enrichment and Quiet Title*

Defendants also move for summary judgment in their favor on Plaintiff's [**52] causes of action for unjust enrichment and to quiet title,[17] asserting as the reasons therefor that Plaintiff has failed to prove the essential elements of each. We note at the outset that to survive a summary judgment motion, the non-moving party is not required to *prove* its case, although it must present sufficient evidence on which a jury could reasonably find in its favor. See, e.g., Jakimas, and Kaucher, both supra. [*562] After reviewing the evidentiary materials in the record of this matter in the light most favorable to the plaintiff, we find that it has indeed mustered sufficient evidence to proceed to trial.

Pursuant to Pa. R. C. P. 1061(b)(3), an action to quiet title may be brought to compel an adverse party to file, record, cancel, surrender or satisfy [**53] of record, or admit the validity, invalidity or discharge of, any document, obligation or deed affecting any right, lien, title or interest in land. Kean v. Forman, 2000 PA Super. 141, 752 A.2d 906, 908 (2000), *appeal denied*, 564 Pa. 712, 764 A.2d 1070 (2000). Rule 1061 was intended to be liberally construed. Brennan v. Shore Brothers, Inc., 380 Pa. 283, 286, 110 A.2d 401, 402 (1955).

In our Memorandum Opinion of October 19, 2012, we held that Plaintiff had sufficiently pled a quiet title claim by alleging that she was a "party in any manner interested in the assignment - *i.e.* conveyance of mortgages recorded in the name of MERS as nominee," and that she had pled "a pecuniary interest which is affected by whether the mortgage assignments which MERS tracks are recorded." See, 904 F. Supp. 2d at 451. The evidentiary materials produced by Plaintiff in opposition to Defendants' Motion for Summary Judgment include, among other things, a statewide summary from the Pennsylvania Department of Revenue showing the total number of instruments (deeds, mortgages and other writs) recorded in each county Recorder of Deeds office and

---

[17]  We note that Defendants re-raise their previously-addressed claim that there is no private right of action to enforce §351 and again challenge the appropriateness of permitting Plaintiff to proceed under a quiet title theory. In the absence of a showing of extraordinary circumstances and in view of our previous rulings on this point, we reiterate that we see no need to reconsider those rulings as per the rule of the case doctrine.

the amounts collected in recording fees for the 2011 calendar [**54] year and a survey prepared by the Philadelphia Department of Records for the period between 2000 and 2012 of the number of MERS and non-MERS recorded documents, as well as a number of Affidavits from attorneys and former attorneys from Community Legal Services, the Pennsylvania Legal Aid Network, and the Housing Alliance of Pennsylvania. (See, Plaintiff's Exhibits "B," "C," "D," "E" and "F"). As these Exhibits demonstrate, over the last twelve years, the number of documents recorded by MERS has steadily increased, while the number of documents recorded by others has steadily decreased. There has, in turn, been a corresponding decrease in the amount of recording fees collected by the county Recorders of Deeds. Inasmuch as Community Legal Services, the Legal Aid Network and the Housing Alliance receive much of their funding and financial support from the collection of, *inter alia*, fees paid to the Recorders of Deeds offices, they too have suffered monetary injury.

In addition, Plaintiff has produced reports from two of its proposed expert witnesses with experience in forensic analysis of chain of title issues and real estate law - Marie T. McDonnell and Charles W. Proctor, III. Ms. McDonnell [**55] reported on her analysis of a MERS mortgage for a residential property in Montgomery County which was originated with Countrywide Home Loans, Inc. in June, 2005, was securitized in late August, 2005, sold at least three times and foreclosed in March, 2013. (See, Plaintiff's Exhibit "G," pp. 3-5). Throughout the process, Ms. McDonnell found that there were five missing assignments that should have been recorded with the Montgomery County Recorder of Deeds, that the MERS Milestones data was incomplete and in contradiction to the securitization deal documents, and that title to the property had been corrupted by MERS' failure to record a complete chain of title. (Exhibit "G," p.7).

In his Declaration, Mr. Proctor attests that licensed title agents have no access to the information in the bar codes which MERS adds to every document that it records or to the MERS data base of exchanges, sales and assignments that [*563] MERS facilitates for the benefit of its customers/members. This means that title searchers and consumers are denied the ability to ascertain who currently owns the note secured by a MERS mortgage and that neither the mortgagor nor the courts can ascertain the chain of events or [**56] the validity of a transaction. This results, according to Mr. Proctor, in an erosion of Pennsylvania's land records and the inability to evaluate the marketability of title and credit worthiness of the consumer. (See, Plaintiff's Exhibit "H," pp. 6-7).

Plaintiff Becker herself also testified that it is the obligation of the Recorders of Deeds to make sure that the chain of title of properties in their county is clear and complete. (See, Plaintiff's Exhibit "A9," Deposition of Nancy Becker dated July 17, 2013, p. 48). Indeed, the Pennsylvania Superior Court has found that "the primary duty of the recorder of deeds is to serve the public by receiving and duly recording any recordable instruments as to serve the future necessities of the law," and that "as the custodian of the county deed books, the recorder of deeds is obligated to protect the public in preserving the integrity of the official records of his or her office." Schaeffer v. Frey, 403 Pa. Super. 560, 567-568, 589 A.2d 752, 756 (1991)(*internal citations omitted).* However, over the past several years, a number of residents who were facing foreclosure didn't know who owned their mortgage or to whom they should be making their [**57] mortgage payments. (Id., 66). Plaintiff attributes this to the fact that MERS is not recording all of the note assignments with the result that not only is there a loss in revenue, but also the land title records are incomplete to the public. (Id., 65-68, 176-177).

Finally, Plaintiff also testified that based on a forensic audit which revealed that a MERS-affiliated mortgage was transferred on average between 4 and 12 times, she conservatively estimates that Montgomery County alone has lost $15.7 million in recording fees. (Id., 178-180). Because we find that all of this evidence is sufficient to demonstrate that a genuine issue of material fact exists with respect to Plaintiff's entitlement to quiet title relief, Defendants' motion for the entry of judgment in their favor as a matter of law on this claim is also denied.

We reach the same conclusion with regard to Plaintiff's unjust enrichment claim. A cause of action for unjust enrichment is a claim by which the plaintiff seeks restitution for benefits conferred on and retained by a defendant who offered no compensation in circumstances where compensation was reasonably expected. White v. Conestoga Title Insurance Co., 617 Pa. 498, 504, 53 A.3d 720, 723 (2012). [**58] A showing of unjust enrichment requires a demonstration that: (1) a benefit was conferred on the defendant; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under circumstances that it would be inequitable for defendant to retain the benefit without payment to the plaintiff. EBC, Inc. v. Clark Building Systems, Inc., 618 F.3d 253, 273 (3d Cir. 2010); Durst v. Milroy General Contracting, 2012 PA Super. 179, 52 A.3d 357, 360 (2012). Here, Plaintiff proffers the videotaped deposition testimony of its former President and CEO, R.K. Arnold in Henderson v. Merscorp, Inc., et. al., a similar action before the Circuit Court for Montgomery County, Alabama:

Q. ... Is it your company's intention to supplement or assist the public land records of the several states with the MERS system to make it more clear about who owns what?

A. No.

 [*564]  Q. Is it your company's intent to supplant the mortgage land records of various states with its system?

A. No. We layer it on top is the way to think of it.

Q. When you say layer it on top, explain that, please.

A. Well, the MERS system couldn't exist if the recording system didn't exist.

Q. But the recording system can exist  [**59] without MERS?

A. Certainly. So we are the mortgagee of record, and there has to be a place for us to establish that. And then we track the servicer.

(See, Plaintiff's Exhibit "A20," 111-112). This testimony is, we find, essentially tantamount to an admission that by maintaining the recording system in Pennsylvania, the county recorders of deeds confer a benefit upon defendants which is in fact appreciated by defendants. Because Defendants do not pay any fees when a note is transferred between its membership fee-paying members, we find that a genuine issue of material fact exists as to whether it would be unjust to allow Defendants to retain the benefits conferred on them without paying Plaintiff and the class whom she represents therefor. Consequently, Defendants' motion for summary judgment as to Count III of the Complaint is also denied.

*G. Plaintiff's Cross Motion for Partial Summary Judgment*

In addition to opposing Defendants' Motion for Summary Judgment, Plaintiff also seeks the entry of partial judgment in her favor as a matter of law pursuant to Count IV of her Complaint and asserts that this Court should now enter an order declaring that Defendants' past and present failures to  [**60] record note assignments among its members constitutes a violation of Section 351 and that Defendants have been unjustly enriched by their actions.

Under the Declaratory Judgment Act, *28 U.S.C. §2201*,

(a) In a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such.

This language has been said to "place a remedial arrow in the district court's quiver," and to confer "a unique and substantial discretion on federal courts to determine whether to declare litigants' rights." Reifer v. Westport Insurance Corp., No. 13-2880, 751 F.3d 129, 2014 U.S. App. LEXIS 8014 *24 (3d Cir. Apr. 29, 2014) (quoting Wilton v. Seven Falls Co., 515 U.S. 277, 286, 288, 115 S. Ct. 2137, 132 L. Ed. 2d 214 (1995)). Generally, the judgment in a suit for declaratory judgment must be responsive to the pleadings and issues presented. Westport Insurance Corp. v. Bayer, 284 F.3d 489, 499 (3d Cir. 2002).  [**61] Indeed, "[w]hen all is said and done," the Supreme Court has concluded, "the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power." Wilton, 515 U.S. at 287, 115 S. Ct. at 2143. A declaratory judgment action is appropriate when the declaration will settle the question presented and terminate the entire controversy - courts are to avoid using declaratory judgment to make abstract determinations or to try the controversy in piecemeal fashion. Pennsylvania Video Operators v. United States, 731 F. Supp. 717, 719 (W.D. Pa. 1990), *aff'd w/o opinion*,  [*565]  *919 F.2d 136 (3d Cir. 1990)*(citing Maryland Casualty Co. v. Rosen, 445 F.2d 1012 (2d Cir. 1971) and Rowland v. Tarr, 378 F. Supp. 766, 769 (E.D. Pa. 1974)).

Over the years, the Third Circuit has enumerated the following factors for district courts to consider when exercising Declaratory Judgment Act discretion. These are:

(1) the likelihood that a federal court declaration will resolve the uncertainty of obligation which gave rise to the controversy;

(2) the convenience of the parties;

(3) the  [**62] public interest in settlement of the uncertainty of the obligation; and

(4) the availability and relative convenience of other remedies.

Reifer v. Westport Insurance Co., 2014 U.S. App. LEXIS at *28 (citing United States v. Pa. Dep't of Envtl. Res., 923 F.2d 1071, 1075 (3d Cir. 1991), Terra Nova Ins. Co. v. 900 Bar, Inc., 887 F.2d 1213, 1224 (3d Cir. 1989) and Bituminous Coal Operators' Assoc. v. Int'l Union, United Mine Workers

of America, 585 F.2d 586, 596 (3d Cir. 1975), *abrogated on other grounds by* Carbon Fuel Co. v. United Mine Workers of Am., 444 U.S. 212, 100 S. Ct. 410, 62 L. Ed. 2d 394 (1979)).

In this matter and in light of the rationale outlined in the preceding sections of this opinion, we must concur with Plaintiff's assertion that declaratory judgment is now properly entered in her favor with regard to Count I of the Complaint such that we now formally declare that the assignment or transfer of a promissory note secured by a mortgage on real estate is, in Pennsylvania, equivalent to a mortgage assignment. We further declare that Defendants' failure to create and record documents evincing the transfers of promissory notes secured by mortgages on real estate in the Commonwealth [**63] of Pennsylvania is, was and will in the future be, in violation of the Pennsylvania Recording law - most particularly 21 P.S. §§351.[18] Plaintiff's motion for partial summary judgment is therefore granted as to Defendants' liability under Count I with the issue of the extent of the damages as a consequence of these violations to be addressed at the trial of this matter.

We must decline to enter summary judgment in Plaintiff's favor as to Count III however. To be sure, while there clearly is evidence that Defendants may have been unjustly enriched as a result of the conduct complained of, we do not find the record to have been sufficiently developed on this claim to allow the entry of judgment as a matter of law or to make an award of damages at this time. Therefore, we leave this claim to be further and finally thrashed out at trial. So saying, Plaintiff's motion for partial summary judgment shall be granted in part.[19]

**Conclusion**

For all of the reasons set forth above, the Defendants' Motion for Summary [*566] Judgment shall be denied in its

entirety and the Plaintiff's Cross-Motion for Partial Summary Judgment shall be granted in part. An appropriate order follows.

**ORDER**

AND NOW, this 30th Day of June, 2014, upon [**65] consideration of the Motion for Summary Judgment of Defendants, Merscorp, Inc. and Mortgage Electronic Registration Systems, Inc. (collectively "MERS Defendants") (Doc. No. 66) and Plaintiff's Cross-Motion for Partial Summary Judgment (Doc. No. 80) and the parties' further Memoranda of Law in Support and in Opposition, it is hereby ORDERED that Defendants' Motion is DENIED in its entirety and Plaintiff's Motion is GRANTED IN PART as outlined in the preceding Memorandum Opinion.

IT IS FURTHER ORDERED that Declaratory Judgment is hereby entered in favor of Plaintiff and against Defendants such that Defendants' are declared to be obligated to create and record written documents memorializing the transfers of debt/promissory notes which are secured by real estate mortgages in the Commonwealth of Pennsylvania for all such debt transfers past, present and future in the Office for the Recording of Deeds in the County where such property is situate.

IT IS STILL FURTHER ORDERED AND DECLARED that inasmuch as such debt/mortgage note transfers are conveyances within the meaning of Pennsylvania law, the failure to so document and record is violative of the Pennsylvania Recording Statute(s).

BY THE [**66] COURT:

/s/ J. Curtis Joyner

J. CURTIS JOYNER, J.

---

[18] Although not specifically pled in Plaintiff's complaint, for the reasons given previously in this Memorandum Opinion, Sections 444, 621 and 623-1 appear to also have been violated.

[19] While it is not entirely clear from the briefing whether Plaintiff is likewise seeking [**64] the entry of summary judgment in the form of permanent injunctive relief, we would deny that relief as well. A plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. Ebay Inc. v. Mercexchange, L.L.C., 547 U.S. 388, 391, 126 S. Ct. 1837, 1839, 164 L. Ed.2d 641 (2006). Specifically, a plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not disserved by a permanent injunction. Id. Indeed, among the remedies sought by Plaintiff is an award of monetary damages. So saying, we cannot find that judgment would be properly now entered in her favor on this equitable claim.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 14-4315

_____

MONTGOMERY COUNTY, PENNSYLVANIA, RECORDER OF DEEDS, by
and through NANCY J. BECKER, in her official capacity as the Recorder of
Deeds of Montgomery County, Pennsylvania,

Plaintiff-Appellee,

v.

MERSCORP, INC., and MORTGAGE ELECTRONIC
REGISTRATION SYSTEMS, INC.

Defendants-Appellants.

_____

Appeal from the July 11, 2014 decision of the United States District
Court for the Eastern District of Pennsylvania Civil Action No. 11-CV-06968
(Honorable Curtis Joyner) certified for interlocutory appeal on
September 8, 2014

_____

**BRIEF OF AMICUS CURIAE THE LEGAL SERVICES CENTER
OF HARVARD LAW SCHOOL AND LAW PROFESSORS
IN SUPPORT OF THE APPELLEE**

_____

MAX WEINSTEIN
CHARLES CARRIERE
K-SUE PARK
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
120 Boylston Street
Jamaica Plain, MA
(617) 390-2694

March 16, 2015

i

**CORPORATE DISCLOSURE STATEMENT**

The Legal Services Center is a program of Harvard Law School at Harvard University, a 501(c)(3) non-profit organization. No party, party's counsel, nor any person other than the amicus curiae authored any part of the brief, nor contributed money intended to fund preparing or submitting the brief.

## TABLE OF CONTENTS

STATEMENT OF INTEREST……………………………………….............. 1

ISSUE TO BE ADDRESSED………………………………………………1

SUMMARY OF ARGUMENT……………………………………………… 1

ARGUMENT……………………………………………………………….. 4

    I.  MERS is a departure from and disruption of the traditional recording practices, upon which it relies…………………………………………….. 4

        A.    Prior to MERS, records of real property interests were public, transparent, and provided a secure foundation upon which the American economy could grow…………………………………………4

        B.    MERS was created to reduce costs for sellers of mortgage-backed securities (MBS)……………………………………..................... 6

        C.    The MERS structure substitutes the MERS name for that of the mortgage lender in the county registry……………………………. 8

        D.    MERS privatized and made the documentation of transfers of mortgage notes optional, discouraging the mortgage industry from maintaining complete records of actual holders of interests in real property……………………………………………………………10

        E.    MERS interferes with Pennsylvania's requirement that purported assignees prove their relationship to the original lender in order to foreclose………………………………………………………….12

        F.    MERS lacks legal authority and public accountability…................. 12

        G.    MERS acts as a placeholder in the traditional recording system, and cannot function without that system …………………………... 17

    II. **MERS helped precipitate the foreclosure crisis and left homeowners without recourse to protect their property rights………….……**………………... 18

        A.    MERS facilitated the securitization of subprime loans……………..18

        B.    MERS increased the costs of enforcing property rights and left homeowners without recourse to challenge wrongful foreclosures........................................................................ 21

        C.    Surveys, audits and public media have exposed the inaccuracy of records in the MERS database…………………………………...22

        D.    Court proceedings and federal agency investigations have exposed the inaccuracy of records in the MERS database…….…..…………24

        E.    MERS's inaccuracy affects not only the properties for which it is named as mortgagee, but all properties adjoining those properties…………………………………….…….……………26

CONCLUSION…………………………………………………………………... 26
CERTIFICATES …………………………………………………………........ 28

# TABLE OF AUTHORITIES

**Scholarly Authorities**                                                        **Page(s)**

Ann M. Burkhart, Lenders and Land, 64 Mo. L. Rev. 249 (1999)……………….. 7

M. Mark Heekin, Modernizing Mortgage Foreclosure Law: A Call for
Transparency and an End to the Payment Rule,
33 Quinnipiac L. Rev. 165 (2014)……………………………………………. 5-6, 21-22

Adam J. Levitin, The Paper Chase: Securitization, Foreclosure, and the
Uncertainty of Mortgage Title,
63 Duke L.J. 637 (2013)…………………………………………….…... 14, 15, 21

Gloria J. Liddell and Pearson Liddell, Jr., Robo Signers: The Legal Quagmire of
Invalid Residential Foreclosure Proceedings and the Resultant Potential Impact
Upon Stakeholders, 16 Chap. L. Rev. 367 (2012) ……...………………………….. 21

Tanya Marsh, Foreclosures and the Failure of the American Land Title Recording
System, 111 Colum. L. Rev. 19 (Sidebar) (2011)……… …………………………. 21

Grant S. Nelson and Dale A. Whitman, Real Estate Finance Law (5th ed.
2007)…………………………………………………………………………………. 5

Joyce D. Patton and Carroll G. Palomar, Patton and Palomar on Land Titles (3d ed.
2003)……………………………………………………...……………………….. 6

Christopher L. Peterson, Two Faces: Demystifying the Mortgage Electronic
System's Land Title Theory,
53 Wm. & Mary L. Rev. 111 (2011)……………………….…………9, 11, 18, 24, 26

Christopher L. Peterson, Foreclosure, Subprime Mortgage Lending, and the
Mortgage Electronic Registration System,
78 U. Cin. L. Rev. 1359 (2010)……………………………………….4, 5-6, 8, 17-21

Powell on Real Property (Michael Allen Wolf ed., 2007)………………………….5

Joseph Singer, Foreclosure and the Failures of Formality,
46 Conn .L. Rev. 497 (2013)……………………………………………………...14

Laura A. Steven, <u>MERS and the Mortgage Crisis: Obfuscating Loan Ownership and the Need for Clarity</u>, 7 Brook. J. Corp. Fin. & Com. L. 251 (2012)……….. 15

Joseph Story, <u>Commentaries on the Constitution of the United States</u> (1833)……………………………………………………………………… 4

Herbert T. Tiffany and Basil Jones, <u>Tiffany on Real Property</u> (1939)............................................................................................................ 5

Alan M. White, <u>Losing the Paper- Mortgage Assignments, Note Transfers and Consumer Protection</u>, 24 Loy. Consumer L. Rev. 468 (2012)………………………………........... 23

David Woolley and Lisa Herzog, <u>MERS: The Unreported Effects of Lost Chain of Title on Real Property Owners</u>, 8 Hastings Bus. L J. 365 (2012)…………………………………………… 26-27

Caryl A. Yzenbaard, <u>Residential Real Estate Transactions</u> (1991). ……………………………………………………………………… 5

**Public Media and Industry Literature**

R.K. Arnold, <u>Yes, There is Life on MERS</u>, 11-Aug. Prob. & Prop. 32 (1997). …………………………………………...8-9, 17

R.K. Arnold, <u>Viewpoint</u>, INSIDE MERS 1 (Jan. Feb. 2004)……………………………………………….20

Arnold Deposition 176-80 (September 25, 2009), on file with the author and available at <https://www.dropbox.com/s/hzrzapyxa7bogw5/MERS-DEPO-OF-CEO-RK-Arnold-2009.pdf?dl=0>…………..……………………………………11

R.K. Arnold (prepared statement), <u>Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Comty. Opportunity of the H. Comm. On Fin. Servs.</u>, 111th Cong. 103-04 (2010) ………………….. ……………………………………...…10

Kate Berry, <u>Foreclosures Turn Up Heat on MERS</u>, Am. Banker 1 (July 10, 2007). …………………………………………………..20

Worth Civils & Mark Gongloff, Subprime Shakeout: Lenders that Have Closed Shop, Been Acquired or Stopped Loans, Wall St. J. Online, available at <http://online.wsj.com/public/resources/documents/info-subprimeloans0706-sort.html> (last visited March 13, 2015) …………………………………………... 24

Memorandum from Covington & Burling to R.K. Arnold, President and CEO, MERSCORP, Inc. (Sept. 1, 1997) (on file with the Duke Law Journal)…………14

Federal Reserve, Office of the Comptroller of the Currency, and Office of Thrift Supervision, Interagency Review of Foreclosure Policies and Practices 10-11 (2011)………………………………………………………………………….. 26

Failed Bank List, Federal Deposit Insurance Corporation (FDIC), available at <http://www.fdic.gov/bank/individual/failed/banklist.html> (last visited March 13, 2015).....…………………………………………………… 24

Mike McIntire, Tracking Loans Through a Firm that Holds Millions, N.Y. Times, April 23, 2009, at B1. ……………………………………….......… 21

MERS Registers 10 Million Loans, Inside MERS 1 (Nov./Dec. 2002)…….…..... 20

MERS Registers 20 Million Loans, Inside MERS 1 (Jan./Feb. 2004)………..… 20

MERS Procedures Manual (v. 27.0), available at <http://www.mersinc.org/join-mers-docman/978-mers-system-procedures-final/file>………...………… 9, 12-13

MERS Rules of Membership, available at <http://www.mersinc.org/join-mers-docman/37-mers-commercial-rules-of-membership/file>………………….… 13

Moody's Investors Service, Mortgage Electronic Registration Systems, Inc. (MERS): Its Impact on the Credit Quality of First-Mortgage Jumbo MBS Transactions, Structured Finance Special (April 30, 1999)………………...…..19

Carson Mullen, MERS: Tracking Loans Electronically, 60:8 Mortgage Banking 62 (May 31, 2000). …………………………………19, 20

Michael Powell and Gretchen Morgenson, MERS? It May Have Swallowed Your Loan, N.Y. Times, March 6, 2011, at BU1. …………………………….... 24-25

Property deed ready for book entry,

19.3 National Mortgage News 20 (Oct. 17, 1994)……………….………………….14

Phyllis K. Slesinger and Daniel McLaughlin, <u>Mortgage Electronic Registration System</u>, 31 Idaho L. Rev. 805 (1995)……………………………………7-8, 13

**Cases**

<u>Culhane v. Aurora Loan Services of Nebraska,</u>
826 F.Supp 2d 352 (D. Mass 2011)……………………………………………12

<u>Escher v. Decision One Mortgage Co.,</u>
369 B.R. 862 n.8 (Bankr. E.D. Pa. 2007). …………………………………16

<u>HSBC Bank USA v. Eslava,</u>
No. 1-2008-CA-055313 (Fla. Cir. Ct. May 6, 2010)………………………………..25

<u>Landmark Nat'l Bank v. Kesler,</u>
40 Kan. App. 2d 325 (2008)…………………………………………………...16

<u>Landmark Nat'l Bank v. Kesler,</u>
216 P.3d 158, 165–66 (2009) …………………………………………………17

**Statutes**

21 Penn. Stat. § 351……………………………………………………………... 6

Pa. R. C. P. 1147 (a)(1) ……………………………………………………….. 12

U.C.C. § 8 (1994). ……………………………………………………………… 16

U.C.C. § 9 (1994)………………………………………………………………... 14

15 U.S.C. § 78 (2010)……………………………………………………………… 16

**STATEMENT OF INTEREST**

All parties have consented to the filing of this brief.

The Legal Services Center (LSC), part of Harvard Law School's clinical program, is a legal services office staffed by Harvard Law School faculty. LSC's clinical faculty offer courses on a range of consumer law topics, including mortgage law, consumer bankruptcy, and student loan law. Instructors also supervise students as part of a client services clinic, and many of LSC's cases involve representation of homeowners facing foreclosure on the basis of MERS loans. LSC's academic role and direct experience with MERS informs its views on MERS practices.

Rebecca Tushnet is a Professor of Law at Georgetown Law. She teaches property law and she has written extensively about consumer protection issues.

Joseph William Singer is Bussey Professor of Law at Harvard Law School. He writes scholarly articles on property law theory, including an analysis of the ways the MERS system conflicts with the traditional legal infrastructure of the American private property system.

David Reiss is a Professor of Law and Research Director at the Center for Urban Business Entrepreneurship at Brooklyn Law School. He writes scholarly articles on real estate finance and consumer financial services.

Melanie Leslie is Vice Dean and Professor of Law at Benjamin N. Cardozo School of Law at Yeshiva University. She teaches property, trusts and estates, and nonprofit law.

The above parties submit this brief supporting the Appellee and respectfully request that the District Court's Declaratory Judgment be upheld.

## ISSUE TO BE ADDRESSED

Is MERS an appropriate and reliable substitute for county-based recording systems, such as exists in Montgomery County through Appellee's Office of the Recorder of Deeds, which have traditionally served as a public basis for ascertaining, enforcing and ensuring the orderly transfer of rights in real property?

## SUMMARY OF ARGUMENT

MERS represents a major departure from and grave disruption of recording practices in counties such as Montgomery County, Pennsylvania, that have traditionally ensured the orderly transfer of real property across the country. Prior to MERS, records of real property interests were public, transparent, and provided a secure foundation upon which the American economy could grow. MERS is a privately run recording system created to reduce costs for large investment banks, the "sell-side" of the mortgage industry, which is largely inaccessible to the public. MERS is recorded as the mortgage holder in traditional county records, as a "nominee" for the holder of the mortgage note. Meanwhile, the promissory note

2

secured by the mortgage is pooled, securitized, and transferred multiple times, but MERS does not require that its members enter these transfers into its database. MERS is a system that is "grafted" onto the traditional recording system and could not exist without it, but it usurps the function of county recorders and eviscerates the system recorders are charged with maintaining.

The MERS system was modeled after the Depository Trust Company (DTC), an institution created to hold corporate and municipal securities, but, unlike the DTC, MERS has no statutory basis, nor is it regulated by the SEC. MERS's lack of statutory grounding and oversight means that it has neither legal authority nor public accountability. By allowing its members to transfer mortgages from MERS to themselves without any evidence of ownership, MERS dispensed with the traditional requirement that purported assignees prove their relationship to the mortgagee of record with a complete chain of mortgage assignments, in order to foreclose. MERS thereby eliminated the rules that protected the rights of mortgage holders and homeowners. Surveys, government audits, reporting by public media, and court cases from across the country have revealed that MERS's records are inaccurate, incomplete, and unreliable. Moreover, because MERS does not allow public access to its records, the full extent of its system's destruction of chains of title and the clarity of entitlements to real property is not yet known.

Electronic and paper recording systems alike can contain errors and inconsistencies. Electronic systems have the potential to increase the accessibility and accuracy of public records, but MERS has not done this. Rather, by making recording of mortgage assignments voluntary, and cloaking its system in secrecy, it has introduced unprecedented and perhaps irreparable levels of opacity, inaccuracy, and incompleteness, wreaking havoc on the local title recording systems that have existed in America since colonial times.

## ARGUMENT

### I. MERS is a departure from and disruption of the traditional recording practices upon which it relies.

**A. Prior to MERS, records of real property interests were public, transparent, and provided a secure foundation upon which the American economy could grow.**

The land title records system has ensured the orderly transfer of American property entitlements and provided a secure platform for private commerce since colonial times. Since the earliest period of British settlement in America, land secured the loans upon which the American economy flourished. Joseph Story, Commentaries on the Constitution of the United States § 182, 164 (1833). The objective of recording laws was then, as it is now, to prevent disputes over property rights, to facilitate the enforcement of property rights and the resolution of disputes that nonetheless arise. Christopher L. Peterson, Foreclosure, Subprime

4

Mortgage Lending, and the Mortgage Electronic Registration System, 78 U. Cin. L. Rev. 1359, 1364-65 (2010) [hereinafter Foreclosure].

For over three hundred years, mortgage records were held as part of the public land title records in the county where mortgaged land was located. M. Mark Heekin, Modernizing Mortgage Foreclosure Law: A Call for Transparency and an End to the Payment Rule, 33 Quinnipiac L. Rev. 165, 193 (2014). As early as 1639, the Connecticut General Court insisted that "all bargaines or mortgages of land whatsoever shall be accounted of no value until they be recorded." 14 Powell on Real Property § 82.01[1][b] (Michael Allen Wolf ed., 2007) (sic). By the time of the Revolution, mortgagees that failed to record their mortgages or assignments risked losing the ability to enforce the terms of their loans. Herbert T. Tiffany and Basil Jones, Tiffany on Real Property § 1457 (1939); Caryl A. Yzenbaard, Residential Real Estate Transactions § 5:7 (1991); Grant S. Nelson and Dale A. Whitman, Real Estate Finance Law § 5.34 (5th ed. 2007). A transparent public record of entitlements in real property has provided certainty in private bargains and a collective reference point that protects communities from commercial chaos after disasters like floods, earthquakes, fire, and hurricanes. Peterson, Foreclosure, supra 4 at 1365. The establishment of a public recording act in each state has thereby long protected all parties holding or dealing in interests in land, and

5

constituted "[t]he cornerstone of America's legal tradition of transparency of landholding interests." Id.

Accordingly, since 1717, Pennsylvania law has mandated that "[a]ll deeds, conveyances, contracts, and other instruments of writing wherein it shall be the intention of the parties executing the same to grant, bargain, sell, and convey any lands, tenements, or hereditaments situate in this Commonwealth … shall be recorded in the office for the recording of deeds in the county where such lands, tenements, and hereditaments are situate." 21 Pa. Cons. Stat. § 351 (West). 1 Joyce D. Patton and Carroll G. Palomar, Patton and Palomar on Land Titles § 4, n. 7 (3d ed. 2003). Prior to MERS, the public recording system, maintained by County Recorders such as Appellee Nancy Becker, provided a public forum in which parties recorded legally operative documents pertaining to transfers of interests in real property. Through the simple but essential service of recording the name of a person or entity that originated a mortgage loan, any party that subsequently sought to purchase a mortgage note could ascertain that a seller possessed the interest he claimed by verifying that his chain of title was complete and derived from the original lender. Heekin, supra 5 at 190. The burden lay upon a party seeking to foreclose to confirm the interest it claimed to hold by showing that same unbroken chain of title.

**B. MERS was created to reduce costs for sellers of mortgage-backed securities (MBS).**

From its planning stages, MERS was conceived as a way of reducing costs for sellers of mortgage-backed securities (MBS). In 1970, the Federal National Mortgage Association (Fannie Mae), the Federal Home Loan Mortgage Corporation (Freddie Mac), and the Government National Mortgage Association (Ginnie Mae), radically changed mortgage lending relationships by originating the creation and sale of mortgage backed securities (MBS)—pools of mortgages, or bonds secured by such pools, for which they sold fractional interests. Ann M. Burkhart, Lenders and Land, 64 Mo. L. Rev. 249 (1999). By the mid-1990s, more than three-quarters of new single-family residential mortgages were being securitized, and Fannie Mae had become the largest corporation in the United States, with assets exceeding $351 billion. Id.

As trade in MBS burgeoned and the costs of securitization increased, the industry sought a means of escaping the "terribly cumbersome" and "costly" process of executing and recording mortgage assignments. Phyllis K. Slesinger and Daniel McLaughlin, Mortgage Electronic Registration System, 31 Idaho L. Rev. 805, 808 (1995). The MERS concept originated in October, 1993, when an industry group comprised of representatives from Fannie Mae, Freddie Mac, Ginnie Mae, and the Mortgage Bankers' Association of America (MBA), published a "white paper" proposing the MERS concept to solicit comments from

7

the real estate finance industry. Id. at 810-11. In June 1994, these parties formed a

Steering Committee and commissioned a study by Ernst & Young, LLP. Mortgage

banking companies made initial capital contributions to incorporate MERS, Inc.

Peterson, Foreclosure, supra 4 at n.61.

In 1995, MBA executives who led the establishment of MERS wrote that

MERS would apply "information technology to reduce processing costs."

Slesinger and McLaughlin, supra 7 at 807. At the time, standard investor

guidelines required that the industry record assignments from the originating

lender to a wholesaler, from the wholesaler to the Seller, and from the Seller to the

Buyer. Meanwhile, an average lender/buyer was "acquiring a $550 million

portfolio of servicing through a bulk purchase of mortgages with an average loan

balance [of] $125,000." Id. at 809. Estimating the recordation costs for portfolios

this size, MBA executives calculate at the time that "[a]ssuming that the portfolio

has 4,400 loans and that recordation is $10 for each loan… the cost of the three

recordations alone would be $132,000." Id. at 810. Furthermore, because investors

would have to pay to prepare documents, track the return of recorded assignments

and possibly rerecord, to correct errors, they concluded that "[o]ver the life of a

loan, the current environment is very costly to the industry." Id. In 1997, then-CEO

of MERS, Inc. R.K. Arnold wrote, "[e]stimates are that MERS will save the

mortgage industry $200 million a year by eliminating the need for many

assignments." R.K. Arnold, <u>Yes, There is Life on MERS</u>, 11 Prob. & Prop. 33, 35 (1997).

### C. The MERS structure substitutes the MERS name for the mortgage lender in the county registry.

After originating a mortgage loan, a lender registers the mortgage under the MERS name in the county recorder's office. Christopher L. Peterson, <u>Two Faces: Demystifying the Mortgage Electronic System's Land Title Theory</u>, 53 Wm. & Mary L. Rev. 111, 116 (2011) [hereinafter <u>Two Faces</u>]. MERS, who is named "solely as nominee," remains the mortgagee even after subsequent transfers of the mortgage note. <u>Id.</u> These subsequent transfers are not recorded in the public registry. Rather, MERS operates a private database and mortgage servicers may <u>voluntarily</u> report changes in "beneficial interests" and servicing rights for individual mortgages. <u>See</u> <u>MERS Procedures Manual</u> (v. 27) at 88-91.[1] Consequently, MERS removes the incentives for its members to retain and aggregate the legal documentation pertaining to such transfers for any given piece of property, astronomically increasing both the likelihood of broken chains of title and the difficulty of detecting fraudulent claims in the absence of documentation showing the legitimacy of prior transfers.

---

[1] Available at <http://www.mersinc.org/join-mers-docman/978-mers-system-procedures-final/file>.

9

When a subsequent holder of the note wishes to foreclose, MERS ostensibly transfers the mortgage to that party. However, in actuality, that party assumes the MERS identity to transfer the mortgage to itself. MERS operates by allowing employees of mortgage servicers, originators, debt collectors, and foreclosure law firms to enter their own names on a webpage that certifies them as assistant secretaries or vice-presidents of MERS for a low fee. Peterson, Two Faces, supra p. 9, at 120; Robo-Signing, Chain of Title, Loss Mitigation, and Other Issues in Mortgage Servicing: Hearing Before the Subcommittee on Housing and Comty. Opportunity of the H. Comm. On Fin. Servs., 111th Cong. 103-04 (2010) (prepared statement of R.K. Arnold, MERSCORP Inc. President and Chief Executive Officer). MERS itself has under fifty employees, but over 20,000 such secretaries and vice presidents, who are not employees of MERS, and do not know simple facts about the company, such as where it is located or who its president is. Id.

**D. MERS privatized and made the documentation of transfers of mortgage notes optional, discouraging the mortgage industry from maintaining  complete records of actual holders of interests in real property.**

The planners of MERS heralded MERS as an electronic system that would more accurately and efficiently record information about successive interests in property. See Slesinger and McLaughlin, supra p. 9, at 806 ("Advanced technology has come to the residential mortgage industry… mortgage lending is being reengineered to reduce costs and deliver a better product"); Arnold, Life on MERS,

10

supra p. 8, at 33 ("MERS is the result of an industry effort to reduce the need for mortgage assignments in the residential mortgage market and thus increase efficiency and reduce costs"). They also emphasized the need for careful recording while they sought to garner support for the project: before MERS was launched, the Senior Director and Director of Technology Initiatives of the MBA wrote that "[c]learinghouse rules will have to be carefully developed to assure the protection of the mortgage rights of participants." Slesinger and McLaughlin, supra 7 at 808.

However, MERS did not develop reliable clearinghouse rules to provide such protection. Rather, it has introduced unprecedented opacity and incompleteness to the record of interests in real estate. First, MERS makes it possible to keep transfers of a mortgage note private once a mortgage is recorded under its name in a county registry, because access to MERS is restricted to its members. The public has no way of identifying the actual owner of a lien on a property and therefore, of holding lenders and investors accountable for errors or fraud.

Moreover, MERS enables incomplete record-keeping by making it voluntary for its members to update information on the MERS database. It does not compel financial institutions to record changes in ownership rights of mortgages, or penalize them for failures to do so. Arnold Deposition 176-80 (September 25,

11

2009).[2] MERS does not keep digital or hard copies of documents embodying agreements through which the beneficial ownership interest in a loan changes hands. Id.; Peterson, Two Faces, supra 8 at 126. Nothing binds MERS members to keep accurate records concerning the beneficial ownership interests of loans, on the MERS database or independently. Moreover, MERS makes no representations or warranties regarding the accuracy or reliability of its database. *See generally* MERS Procedures Manual, supra p. 12. Simply put, "MERS is the Wikipedia of land registration systems." Culhane v. Aurora Loan Services. 826 F. Supp. 2d 352 (D. Mass. 2011) aff'd, 708 F.3d 282 (1st Cir. 2013).

### E. MERS interferes with Pennsylvania's requirement that purported assignees prove their relationship to the original lender in order to foreclose.

MERS has also obstructed foreclosing plaintiffs' ability to comply with the requirements for initiating a foreclosure action under Pennsylvania law. The Pennsylvania Rules of Civil Procedure require a foreclosure plaintiff to set forth in its complaint "the parties to and the date of the mortgage, and of any assignments, and a statement of the place of record of the mortgage and assignments." Pa. R. C. P. 1147 (a)(1) (emphasis added). However, in direct contravention of these requirements, MERS never requests or possesses proof that one of its members in fact holds the mortgage note or is the agent of the note holder when that member

---

[2] Available at https://www.dropbox.com/s/hzrzapyxa7bogw5/MERS-DEPO-OF-CEO-RK-Arnold-2009.pdf?dl=0.

12

seeks to foreclose. Rather, it allows its member's certifying officer to assign the mortgage at will, without reviewing the records to confirm that the party receiving the transfer is entitled to enforce the mortgage. MERS Rules of Membership 29-34;[4] MERS Procedures 124-25.[5] MERS possesses no legal authority to create special rules that absolve its members of the Pennsylvania state requirement, which non-MERS institutions continue to observe, that entities seeking to foreclose must plead and prove a recorded full chain of title.

### F. MERS lacks legal authority and public accountability.

The creators of MERS did not lobby Congress for a uniform, electronic mortgage system that could have retained the public recording system's transparency and reduced costs. Rather, without judicially or statutorily recognized legal authority, they independently launched MERS as a private system, and created legal theories to legitimate the system post facto. In Professor Joseph Singer's words, MERS allowed banks "to be prolific about securitizing those mortgages but complacent about formalizing mortgage assignments. The result was that the banks made many, many mistakes in keeping track of these transactions. Formal records of mortgage transfers are often incomplete or incorrect; the chain of title for many properties appears to be irretrievably broken."

---

[4] Available at <http://www.mersinc.org/join-mers-docman/37-mers-commercial-rules-of-membership/file>.
[5] Available at <http://www.mersinc.org/join-mers-docman/978-mers-system-procedures-final/file>.

13

Joseph Singer, <u>Foreclosure and the Failures of Formality,</u> 46 Conn. L. Rev. 497, 503-04 (2013).

MERS stands on agency-law principles, which, as Professor Adam Levitin of Georgetown Law notes, raise numerous questions in the context of mortgage loans. No provisions specifying the bounds of agency law exist in state mortgage recordation statutes, as for security interests in personalty.[6] Adam J. Levitin, <u>The Paper Chase: Securitization, Foreclosure, and the Uncertainty of Mortgage Title</u>, 63 Duke L.J. 637, 680 (2013).

From its earliest stages, the creators of MERS were aware that differences in states' real-property law would affect MERS's validity. Daniel McLaughlin, director of technology for MBA, acknowledged in 1994 that the mortgage industry "faced unique problems that the securities industry did not have," namely that "[w]e have fifty states with their own systems and laws that we have to comply with." <u>Property Deed Ready for Book Entry</u>, 19.3 Nat'l Mortgage News 20 (Oct. 17, 1994). Nevertheless, MERS conducted no fifty-state analysis of the potential impact of its operations. Memorandum from Covington & Burling to R.K. Arnold, President and CEO, MERSCORP, Inc. (Sept. 1, 1997) (on file with the Duke Law Journal). MERS's attempt to establish "facts on the ground supporting its existence

---

[6] The U.C.C. expressly permits the recording of financing statements for security interests in personalty in the name of a "representative of the secured party"; failure to indicate this representative capacity does not affect the U.C.C. financing statement's validity. *U.C.C. §§ 9-502, 9-503.*

14

therefore does not deserve deference, and in practice has not worked. State laws have unsurprisingly taken disparate positions with respect to numerous aspects of MERS, and borrowers are now impacted in vastly different ways based on their jurisdiction. Laura A. Steven, <u>MERS and the Mortgage Crisis: Obfuscating Loan Ownership and the Need for Clarity</u>," 7 Brook. J. Corp. Fin. & Com. L. 251, 256-57 (2012).

In design, MERS was meant to mimic the structure of the Depository Trading Company (DTC), and similarly replaces the lender as the mortgagee in local land records to immobilize legal title to mortgages. The DTC is a common agency structure for securities trades that was created to resolve the "Wall Street Paperwork Crisis" of the 1960s, when the volume of daily trades made the then requisite delivery of physical stock certificates and bonds from sellers to buyers impractical.[7] However, the DTC does not legitimize the MERS structure as precedent, because no equivalent statutory or regulatory framework exists for MERS as for the DTC; MERS's lack of legal foundation and oversight is radically new.

The DTC operates within a statutory framework as a "securities intermediary" under U.C.C. Article 8. The law makes clear that the DTC holds but

---

[7] Instead of listing individual investors as registered securities' owners with various firms, corporate-securities registrations now list the DTC as a common nominee, and the DTC tracks ownership of the securities in its books and holds physical securities in its vaults. The DTC immobilizes between 85-90% of all equities, corporate, and municipal bonds issued in paper form in the United States. Levitin, <u>supra</u> p. 14 at 680-81.

15

does not own physical securities, which remain the property of investors. U.C.C. §§ 8-102, 8-502. Further, the statute sets out investors' rights vis-à-vis third parties, and the DTC has legal duties to comply with investors' instructions. U.C.C. §§ 8-502, 8-506, 8-507, 8-510, 8-511. Finally, the SEC regulates the DTC as a registered clearing agency, and must approve DTC rules. 15 U.S.C. §§ 78s, 78q(1).

Again, MERS lacks any comparable statutory authority and regulation. Its lack of legal foundation means that it has been able pursue arguments most favorable to its growth in any given situation, even when those arguments contradict each other in different jurisdictions. For example, when MERS has brought foreclosure actions, it has argued that it was an actual mortgagee or assignee. See, e.g., Landmark National Bank v. Kesler, 40 Kan. App. 2d 325, 327 (2008) ("MERS claims that it holds the title to the second mortgage… MERS objects to its characterization as an agent."). However, when faced with suits alleging fraud, deceptive practices, or when it wished to avoid license and registration requirements, it argued that it was merely an agent without exposure to liability, and did not have the same power as a mortgage owner. See, e.g., Escher v. Decision One Mortgage Co., 369 B.R. 862 n.8 (Bankr. E.D. Pa. 2007) ("MERS's role as nominee leads the Court to conclude that it cannot be liable on any of the Plaintiff's [Truth in Lending or Pennsylvania consumer protection]

claims. A nominee is understood to be an agent for another."). See also Peterson, Foreclosure, supra p. 4, at 1376. MERS's adoption of inconsistent positions across jurisdictions to obtain favorable outcomes in litigation underscores its fundamental lack of legal authority. See also Landmark Nat'l Bank v. Kesler, 289 Kan. 528, 216 P.3d 158, 165–66 (2009) (stating that MERS defines its role "in much the same way that the blind men of Indian legend described an elephant—their description depended on which part they were touching at any given time").

MERS's contradictory claims to be both agent of a mortgagee and also the actual mortgagee are especially alarming since MERS professes that its strongest claim to legal authority lies in the principles of agency law. Without legal foundation, MERS has exploited its lack of legal oversight to usurp the function of the state's County Recorders, and trample on the long-tended records of interests in land, to reduce recording costs for mortgage bankers.

### G. MERS acts as a placeholder in the traditional recording system, and cannot function without that system.

MERS inserts a placeholder in the public record. It thereby grafts itself onto systems for recording interests in land, while rendering that recording meaningless. By resting its system on the placeholder record of its name, it allows all subsequent activity related to the mortgage loan to ensue without internal or external regulation. MERS therefore consists of private contractual arrangements that derive what questionable legality they possess by "grafting" the MERS system

17

onto local land-recording offices, a preexisting public legal structure. As R.K. Arnold, CEO of MERS until 2011, noted, "because MERS is premised on an assignment recorded in the public land records, MERS cannot work without county recorders." Arnold, Life on MERS, supra p. 8, at 703.

MERS has therefore privatized the majority of mortgage records in the country while undermining the value of county public records. Peterson, Two Faces, supra p. 9, at 132 (2011). MERS purports to simplify the process of trading mortgage-backed securities, because it has taken the liberty of eliminating requirements for documenting changes to the beneficial ownership interests in real property. MERS, in effect, creates a lacuna in the record, and makes meaningless the record onto which it is grafted. As Professor Christopher Peterson writes, "Recording mortgages in MERS's name and subsequent refusal to record assignments is not a technological innovation. On the contrary, it is an example of atrophy of the mortgage market's information infrastructure and the rule of law." Peterson, Foreclosure, supra p. 4, at 1404.

## II. MERS helped precipitate the foreclosure crisis and left homeowners without recourse to protect their property rights.

### A. MERS facilitated the securitization of subprime loans.

MERS's impact on homeownership and the mortgage industry has had broad national consequences, including but not limited to the foreclosure crisis of 2008. These consequences have caused significant and continuing distress for

18

Pennsylvania's cities and homeowners, which Pennsylvania's recording statute was meant to protect.

Since MERS increased the speed and the volume at which mortgage-backed securities could be traded while reducing recording costs, the mortgage finance industry quickly embraced recording and foreclosing its mortgage loans in MERS's name, rather than the actual parties in interest. Industry players did not embrace MERS based on the passage of legislation or a landmark court ruling, since none legitimized the creation of MERS. Rather, mortgage industry insiders reported that the key development that led them to use MERS was its endorsement by credit rating agencies such as Moody's, Standard and Poor's, and Fitch Investment. Peterson, Foreclosure, supra p. 4, at 1373; Carson Mullen, MERS: Tracking Loans Electronically, 60:8 Mortgage Banking 62, 65 (May 31, 2000). In particular, Moody's published an opinion approving of MERS despite its acknowledgment that the system's legality in every state was uncertain. Moody's Investors Service, Mortgage Electronic Registration Systems, Inc. (MERS): Its Impact on the Credit Quality of First-Mortgage Jumbo MBS Transactions at 3, Structured Finance Special (April 30, 1999) ("Although in many states the assignment of mortgage does not have to be recorded when the note is transferred, there are some states that require the assignment of mortgage to be recorded so that the buyer of the loan is protected against subsequent transferees and creditors of

19

the seller of the mortgage. There are also some states where the law is uncertain as to the protection afforded loan buyers against subsequent transferees and creditors of the loan seller.").

Although they were on notice that MERS would legally conflict with the laws in some states, mortgage industry insiders, including Moody's, pursued or encouraged the pursuit of the immediate financial opportunities the system presented, rather than seek structural adjustments that would respect the rights that conflicting state laws protected. By 1999, private label subprime mortgage securitizers had begun using MERS. Peterson, Foreclosure, supra p. 4 at 1370; Mullen, supra p. 19, at 64. In the early 2000s, the use of MERS exploded, and by late 2002 MERS had recorded its name in place of actual assignees and mortgagees in ten million residential home mortgages. MERS Registers 10 Million Loans, Inside MERS 1 (Nov./Dec. 2002). As the subprime mortgage refinancing industry boomed, MERS registered 21,000 loans on its system each day on average. A year later, the number of loans recorded in MERS's name doubled to twenty million. MERS Registers 20 Million Loans, Inside MERS 1 (Jan./Feb. 2004). MERS's then CEO R.K. Arnold proclaimed that MERS's mission was to "capture every mortgage in the country." R.K. Arnold, Viewpoint, Inside MERS 1 (Jan. Feb. 2004). By May of 2007, it had tripled again to sixty million mortgage loans. Kate Berry, Foreclosures Turn Up Heat on MERS, Am. Banker 1 (July 10, 2007).

20

Subsequently, MERS, as Christopher Peterson has written, "was an important cog in the machine that churned out the millions of unsuitable, poorly underwritten, and incompletely documented mortgages that were destined for foreclosure" in the recent mortgage crisis. Peterson, Foreclosure, supra 4 at 1407. As Wake Forest Law School Professor Tanya Marsh observed in 2011, many scholars and policymakers found that MERS's lack of transparency, along with the increasing complexity of transactions, contributed to the recent financial crisis. Foreclosures and the Failure of the American Land Title Recording System, 111 Colum. R. Rev. 19 (2011) (Sidebar). The New York Times reported in 2009 that MERS had "played an integral, if unsung, role in the proliferation of mortgage-backed securities that fueled the housing boom." Mike McIntire, Tracking Loans Through a Firm that Holds Millions, April 23, 2009, at B1.

### B. MERS increased the costs of enforcing property rights and left homeowners without recourse to challenge wrongful foreclosures.

MERS's up-front savings for financial institutions that securitized mortgages came at the expense of certainty and enforceability of property rights. When the mortgage backed securities market crashed, MERS frequently could not identify and locate the holders of the mortgage notes that had been bundled. Heekin, supra p. 5 at 191; Gloria J. Liddell and Pearson Liddell, Jr., Robo Signers: The Legal Quagmire of Invalid Residential Foreclosure Proceedings and the Resultant Potential Impact Upon Stakeholders, 16 Chap. L. Rev. 367 (2012). The principal

21

issue that has caused foreclosures to be set aside has been the inability of many foreclosing lenders to produce the original mortgage note when called upon to do so. Heekin, supra 4-5 at 171.

However, such foreclosures are only ever set aside after protracted, expensive foreclosure litigation. The reduced ability to clearly ascertain property rights has thus led to tremendous costs in the enforcement of property rights. As Professor Levitin observes, the rise of foreclosures and foreclosure litigation in 2007 revealed how MERS, and its alterations to the processes of mortgage transfer, "shifted costs from deal formation to deal enforcement." Levitin, supra at 649. When one compares these costs to the costs of record-keeping that the industry targeted for elimination, $10 per recordation, amounting to around $30 per loan, seems a small amount to pay to protect a family's interest in the ability to discover who owns their loan, who would execute a foreclosure proceeding against them, and to challenge a party attempting to do so on the basis of mistake or fraud. The costs of recordation that the industry now "saves" constitutes only a very small fraction of each $125,000 loan, and has come at the loss of the security of someone's *home*. Furthermore, MERS has shifted the costs of resolving the problems caused by MERS's poor documentation practices to courts of the same cities, now suffering as a result of the foreclosure crisis, at the expense of whom large investment banks "saved" those initial costs in recording fees.

22

**C. Surveys, audits and public media have exposed the inaccuracy of records in the MERS database.**

It is practically impossible to track errors or detect fraud through the MERS system both because MERS does not require that its members record the necessary documentation <u>and</u> because MERS does not make its records available to the public. Because MERS records are shrouded in secrecy, it is also impossible to know just how incomplete or inaccurate MERS records are. However, surveys and reporting by public media have suggested that the MERS database is alarmingly inaccurate.

One survey of 396 foreclosure cases in six judicial foreclosure states found that "the plaintiff asserting the right to foreclose matched the identified 'investor' in MERS database only twenty percent of the time." Alan M. White, <u>Losing the Paper-Mortgage Assignments, Note Transfers and Consumer Protection</u>, 24 Loy. Consumer L. Rev. 468, 486 (2012). An audit in California, a non-judicial foreclosure state, found that the beneficiary on the foreclosure sale deed only matched MERS's "investor" field forty-two percent of the time. <u>Id. at 487</u> (citing Aequitas Compliance Solutions, Inc., <u>Foreclosure in California: A Crisis of Compliance</u> 7 (2012)). This figure excluded cases where MERS did not disclose an investor. <u>Id.</u>

In 2011, the New York Times reported that MERS and its member banks "apparently lost or mistakenly destroyed loan documents" in thousands of cases,

23

and often confused and misrepresented which entities owned mortgage notes. Michael Powell and Gretchen Morgenson, <u>MERS? It May Have Swallowed Your Loan</u>, N.Y. Times, March 6, 2011, at BU1. Homeowners were left to try to contact mortgage servicing and origination companies, or federally insured banks, which often did not have accurate records of their own, and which collapsed during the foreclosure crisis by the hundreds. Peterson, <u>Two Faces</u>, <u>supra</u> p. 9, at 126; Worth Civils & Mark Gongloff, <u>Subprime Shakeout: Lenders that Have Closed Shop, Been Acquired or Stopped Loans</u>, Wall St. J. Online;[8] Failed Bank List, <u>Federal Deposit Insurance Corporation</u> (FDIC).[9]

### D. Court proceedings and federal agency investigations have further exposed the inaccuracy of records in the MERS database.

Mortgage servicing companies, banks, courts and government agencies have all expressed astonishment at the extent to which MERS database is inaccurate. In 2009, a Florida mortgage origination and servicing company called Diversified Mortgage (Diversified) sued MERS over the uncertainty in ownership of Florida mortgages registered on MERS. Diversified complained that MERS may have allowed Diversified's trading partners to list themselves as owners of Diversified's loans without permission from Diversified. Peterson, <u>Two Faces</u>, <u>supra</u> p. 9, at

---

[8] Available at <http://online.wsj.com/public/resources/documents/info-subprimeloans0706-sort.html> (last visited March 13, 2015).
[9] Available at <http://www.fdic.gov/bank/individual/failed/banklist.html> (last visited March 13, 2015).

131. Diversified claimed that when asked to produce a list of all its trading partners that may have made this claim, MERS could not or refused to do so, eventually became "confusing and hostile," and "demanded that Diversified not attempt further contact with MERS." Id. at 132. Diversified then learned that other third-party financial institutions had initiated foreclosure proceedings on mortgages that Diversified believed it owned. Id. at 132-33.

In another Florida case, Judge Jennifer Bailey, a circuit court judge in Miami stated of 60,000 foreclosures filed in 2009 in her court, "[A]lmost every single one of them… represents a situation where the bank's position is constantly shifting and changing because they don't know what the Sam Hill is going on in their files." Transcript of Hearing on Order to Show Cause at 5, HSBC Bank USA v. Eslava, No. 1-2008-CA-055313 (Fla. Cir. Ct. May 6, 2010). Janis Smith, a spokeswoman for Fannie Mae, admitted Fannie Mae kept its own records and that "We would never rely on it [MERS] to find ownership." Powell and Morgenson, supra p. 32.

In 2011, the Federal Reserve, the Office of the Comptroller of the Currency, and the Office of Thrift Supervision conducted an on-site review of MERSCORP and MERS. They found, as they wrote in an Interagency Report on their review of foreclosure policies and practices, significant weaknesses in MERS's oversight, management supervision and corporate governance that merited bringing formal

25

enforcement action against MERS under the Bank Service Company Act and the Federal Deposit Insurance Act. Federal Reserve, Office of the Comptroller of the Currency, and Office of Thrift Supervision, <u>Interagency Review of Foreclosure Policies and Practices</u> 10-11 (2011). Additionally, the Interagency Report found that servicers had failed in conducting appropriate due diligence assessments of and quality control processes pertaining to MERS, by failing to monitor, evaluate, and appropriately manage the MERS contractual relationship, assess internal control processes at MERS, ensure the accuracy of servicing transfers, and ensure that servicers' records matched MERS records. <u>Id.</u>

### E. MERS's inaccuracy affects not only the properties for which it is named as mortgagee, but all properties adjoining those properties.

Not only is it difficult and sometimes impossible to track down who is the beneficial owner of the borrower's obligation, but MERS clouds or renders unmarketable properties of neighbors to a foreclosed property in other respects. As David Woolley, a California Licensed Land Surveyor and Certified Fraud Examiner with over two decades of experience, has noted, MERS does not comply with first in time (race) or constructive or actual notice statutes, so senior/junior property rights cannot be determined when discrepancies arise in property boundary lines. David Woolley and Lisa Herzog, <u>MERS: The Unreported Effects of Lost Chain of Title on Real Property Owners</u>, 8 Hastings Bus. L. J. 365, 366 (2012). Thus, MERS destroys adjoining property rights and records of

26

homeowners who never defaulted on mortgages and are now forced to litigate boundary disputes. Id.

## CONCLUSION

MERS has largely replaced the formerly transparent public record of mortgage interests with a partial, inaccurate and inaccessible private registry that greatly increased the likelihood of fraud and litigation. For the first time in the history of the nation, there is no longer an authoritative public record of interests in land in each county. For the above reasons, to uphold Pennsylvania law, and to allow Montgomery County to begin to reconstitute the damage to the record MERS has wrought, the Order on Appeal should be affirmed.

Respectfully submitted,

/s/ Max Weinstein

Max Weinstein
Charles Carriere
K-Sue Park
Legal Services Center of
Harvard Law School
120 Boylston Street
Jamaica Plain, MA
(617) 390-2694

/s/ Rebecca Tushnet

Rebecca Tushnet
Professor of Law at Georgetown Law

/s/ Joseph William Singer

Joseph William Singer
Bussey Professor of Law at Harvard Law School

/s/ David Reiss

David Reiss
Professor of Law and Research Director at the
Center for Urban Business Entrepreneurship

/s/ Melanie Leslie

Melanie Leslie, Vice Dean and Professor of Law at
Benjamin N. Cardozo School of Law

Dated: March 23, 2015

**CERTIFICATES**

I, Max Weinstein, hereby certify that:

1. I caused a true and correct copy of the foregoing Brief of Amicus Curiae to be served upon all counsel of record via the Court's ECF system, in accordance with L.A.R. Misc. 113.4, on this the 23rd day of March, 2015.

2. The Brief of Amicus Curiae was filed with the Court via the Court's ECF system, and by Fedex, postage prepaid, in accordance with Rule 25(a)(2)(B) of the Federal Rules of Appellate Procedure.

3. I am admitted to the bar of the Third Circuit.

4. This Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,924 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B).

5. This Brief further complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-Times New Roman.

6. In addition, I certify that the Brief filed electronically is identical to the Brief that is being filed in paper form. I also certify that the document

was subject to a virus check pursuant to the Center's virus check system,

Microsoft Endpoint Protection, and no virus was detected.

<u>/s/ Max Weinstein</u>
Amicus Curiae